34 C.C.P.A.(Patents)

## Application of DRYER.
## Patent Appeal No. 5314.

Court of Customs and Patent Appeals.
June 17, 1947.

506

William H. DeBusk, of Chicago, Ill., for appellant.

W.W.Cochran, of Washington, D. C. (Joseph Schimmel and H. B. Ledman, both of Washington, D. C., of counsel), for the Commissioner of Patents.

Before BLAND, Acting Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

O'CONNELL, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the action of the Primary Examiner in rejecting claims 1, 2, 3, 4, 15, 18, and 20, in appellant's application for a patent for alleged "new and useful improvements in Process and Apparatus for Surfacing Sheet Material."

Appellant petitioned the board to reconsider its decision. The board reconsidered the decision but declined to make any change therein.

The examiner required appellant to make division between the claims for process and the claims for apparatus. Having done so, appellant elected to prosecute the claims for process. All the rejected claims are therefore directed to the process.

Appellant has moved to dismiss the appeal with respect to claims 1, 2, and 3. That motion will be granted, thereby limiting the appeal to the four remaining claims, 4, 15, 18, and 20.

The references are:

Freegard, 1,998,078, April 16, 1935.
Penley et al., 2,074,131, March 16, 1937.
Limerick, 2,111,565, March 22, 1938.
Walton, 2,157,944, May 9, 1939.

Claim 4 is illustrative and reads as follows:

"4. Process of surfacing a web which comprises moving an elongated web in the direction of its length, providing a plurality of separate supplies of comminuted surfacing materials, successively initiating flow of said comminuted materials from said supplies toward a face of said web at intervals of time predetermined in relation to said web movement, stopping flow of said comminuted materials from respective supplies after said flows respectively have been established for predetermined time periods which are independent of said time intervals to measure independently of variations in said web movement predetermined quantities of said comminuted materials discharge from· said supplies to form masses for application to said web, and varying said time periods of flow from said supplies individually to vary the amounts of said comminuted materials in said masses."

Appellant correctly states that—

"Claims 15, 18 and 20 include the step of laying the comminuted grit material in sub-divided quantities on the moving web or otherwise feeding the material to predetermined lengths of the web or in timed relation to the movement of the web."

Appellant alleges in his specification that to lessen the objection to processes old in the art as represented, for example, by the reference patent to Penley et al., a pre-assortment of the different colored covering elements by hand has been used by him to

reduce the occurrence of a regular checkerboard effect or large areas of the same color when the elements are assembled on a structure.

This is done by appellant, according to his specification, by so modifying the processes of the prior art that a multi-color web having a wide variety of color areas both as to length and arrangement may be produced while making it possible readily to change the color area length and to accurately measure the material for each area regardless of variations in web movement and other conditions.

The claimed process is more particularly directed to the surfacing of composition roofing material with surfacing granules of different colors, and for producing on the face of a roofing web a variety of colored areas in different predetermined arrangements in order to make possible the cutting from the surfaced web of covering elements carrying a variety of colors.

In the operation of the process a series of six bins is mounted on frame members at each side of the machine. The bins are spaced apart in the direction of web movement and have lower outlet openings extending transversely across the web.

Each bin is supplied with differently colored grit material, and the lower outlet opening thereof is provided with a gate which extends the full width of the bin outlet.

The described gates are used to control the flow of the material to each of two hoppers, supported by lower frame members at each side of the machine. The hoppers are each arranged with a wide upper opening below the outlet gates and receive the comminuted surfacing material discharged from the bins.

Supported on stub shafts at each side of the machine are two feed rolls which are positioned adjacent the outlet openings with which the respective hoppers have been provided. The hoppers receive the delivery of the materials discharged from the bins and effect its distribution over the upper face of the web to produce a desired pattern upon the surface of the web such, for example, as contiguous or spaced transverse stripes of variegated colors.

The elongated web is started and continuously driven horizontally in the direction of its length underneath the distribution hoppers and the two feed rolls, which are continuously driven by a connection to the web drive to effect clockwise rotation of the rolls at a rate in accordance with the rate of web travel.

Appellant's method for uniformly distributing the comminuted material on the surface of the web in predetermined quantities is further described by the Solicitor of the Patent Office as follows:

"Each of the six bins 11–16 contains granular material of a different color. One of the three bins 14–16 feeds material to hopper 21 during an interval timed so that feeding thereof by roll 31 will begin in such relation to the termination of feeding by roll 30 as to place the desired color pattern upon the web. The operation continues in the next time interval with the placing of material from one of bins 11–13 into hopper 20 at the time when feeding by roll 30 again is desired.

"Each of the six gate valves 18 controls the feeding from the respective one of bins 11–16 into the associated hopper 20 or 21. The electrical circuit indicated in Fig. 4 controls the actuation of gate valves 18. The commutator 101, driven from the web drive, causes opening of each of the valves 18 to initiate delivery of material therefrom in the sequence necessary to form the selected pattern. An independent and separately adjustable timing device closes each valve upon the elapse of a time period selected to place the desired quantity of material in the hopper for delivery to the web. The operation of the timing device in closing the valve is independent of the web movement."

Appellant states his position here in the following excerpt from his brief:

"All four of the prior art patents relied upon by the Examiner in the appeal disclose devices for applying comminuted material to a web for forming a roofing product. In each of said patent devices, comminuted material is discharged from a hopper into position on a horizontally moving web, and in each instance there is provision for feeding a plurality of streams

508

of differently colored surfacing materials. The organizations of the different refcrences are different from each other, however, just as they are all different from the apparatus by which appellant carries out his process."

More particularly, appellant contends that his process comprises a plurality of steps which includes steps not described or suggested by the reference art; namely, of (1) varying the quantity of grit material fed to a "correspondingly-sized" zone on the surface of the web by adjustment of the time period of flow independently of movement of the web, and of (2) applying accurately measured amounts of grit material to pre-determined lengths of the web in subdivided quantities from two sources of supply alternately after the measuring operation.

The disclosure of the reference patents, like the disclosure of appellant's application, involves a multitude of structural elements in a complicated system of apparatus. The only question here presented is whether certain elements defined by the appealed claims set forth definite and distinct elements which patentably distinguish them over the art relied upon by the tribunals of the Patent Office. In view of that fact, it would serve no useful purpose to enumerate in detail all the features of the four respective references.

■ The structural elements of the apparatus by which the processes of the reference patents are carried out differ in certain respects from the structural elements by which appellant carries out his process. Such difference does not constitute patentable subject matter, however, if the cited references suggest to any person skilled in the art to do, without the exercise of the inventive faculty, the thing that appellant has done. In re Stover, 146 F.2d 299, 32 C.C.P.A. (Patents) 823.

■ In other words, a prior patent does not lose its validity as a reference by its failure to describe in detail a thing that is obvious to any person skilled in the art and which may be accomplished without the exercise of the inventive faculty. Travis v. Baker et al., 137 F.2d 109, 30 C.C.P.A. (Patents) 1271; Application of Beach, 152 F.2d 981, 33 C.C.P.A. (Patents) 815.

■ The patent to Freegard meters the material independent of the web movement and has independent control of the quantity of the discharge. In the disclosure of the patent to Penley et al., the feed of the material is proportional to the movement of the coated sheet.

The patent to Walton shows the general arrangement of an apparatus quite similar in operation to that defined by the claims on appeal, and provides a method whereby the quantity of material fed to the sheet is varied. The discharged material is first laid upon a given length of apron and then upon a given length of the sheet, and the cycle of the color masses is repeated in a given length of travel of the sheet.

The metering of the individual amounts of material as disclosed by the patent to Walton is withdrawn in accordance with the "elapse" of time, which limitation is described in the specification as follows:

"* * * The interval of time in which the slot 93 carried by the frame 86 may be moved from the position of cut-off of material from one compartment to that of the cut-off of the material from the succeeding compartment substantially may equal that required to withdraw from the slot a given amount of the material in the slot, which amount, for the purposes of the invention, will be a color mass. * * *"

After stating that claims 15 and 20 are similar to claim 1 in the respect that claim 1 does not. state the invention as it is described because the quantity of material delivered is not independent of the web movement, and that the start of slate delivery is controlled by or dependent on the web movement as stated in claims 2, 3, 4, and 18, the board held as follows:

"The examiner does not discuss the prior art references nor does appellant deny that these references disclose full automatic control of the discharge of slate onto the web.

"Freegard meters the slate independent of the web movement as stated in claims 1, 15 and 20.

"Penley et al. preferably drive rolls 39 from the drive for rolls 85 so that the feed of granular material to the sheet is proportional to the movement of the coated

sheet. However, this is a matter of choice as shaft 53 may be driven from a suitable source of power and the shaft 100 (Fig. 6) is driven by an electric motor.

"We are satisfied that claims 1, 15 and 20 do not define a process distinctly and patentably different from those of Penley et al. or Freegard.

"As to the other claims, Walton meters the quantity of material independently of the time interval of repetition of discharge by adjusting plate 77. The process distinctions over Walton or Freegard are indistinct and indefinite. In Freegard, the connections 63, 64, 65 repeated cause discharge as stated in claim 2 and the independent control of the quantity is by plate 25.

"The examiner seems to be of the opinion that all appellant has done is to change the conventional automatic feature to a non-automatic feature. As stated in claims 2, 3 and 4, we think appellant has done more than this, but we regard the invention as a mechanism and not to the concept of its function or mode of operation as stated in the claims in process form.

"The concept of independently controlling the time for the discharge is not in our opinion a proper process limitation. It is only a functional attribute of desirable apparatus to effect this result."

We agree with the conclusion of the board that whatever appellant has done in the construction of his device, as defined by the appealed claims, does not amount to invention in view of the cited prior art.

We have examined the disclosures of the reference patents together with the arguments and authorities cited by appellant in support of his position, and are of opinion that his alleged process, as defined by claims 4, 15, 18, and 20, does not constitute patentable subject matter.

The appeal as to claim 1, 2, and 3 is dismissed, and, for the reasons stated, the decision of the Board of Appeals with respect to claims 4, 15, 18 and 20 is affirmed.

Affirmed.

By reason of illness, GARRETT, Presiding Judge, was not present at the argument of this case and did not participate in the decision.