37 C.C.P.A. (Patents)

**Application of HOYLER.**

**Patent Appeals No. 5631.**

United States Court of Customs
and Patent Appeals.

April 3, 1950.

Conder C. Henry, Washington, D. C. (Morris A. Rabkin, Camden, N. J., of counsel), for appellant.

E. L. Reynolds, Washington, D. C., for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges.

JOHNSON, Judge.

Thirteen claims in appellant's patent application were rejected in the Patent Office by the Primary Examiner on a combination of references, the Board of Appeals affirming, and are now before us on appeal as provided under 35 U.S.C. § 59a, 35 U.S.C.A. § 59a, R.S. § 4911. One method claim was allowed in the Patent Office.

The invention relates to an improvement in the method of bonding electrically materials, at least one of which is thermoplastic. The specification describes the improvement as the application of heat to the materials to be bonded together through the use of a high frequency electric field established between cooperating electrodes connected to a high frequency oscillation generator. The process requires that at least one of the materials to be bonded be a dielectric. The heat occurs through dielectric losses when the materials are passed between the electrodes. The elec-trodes are in the form of rollers, and are of sufficient mass to conduct heat away from the surface of the material as they press against it upon either side. The roller electrodes are positioned upon a stand and connected by shafts or otherwise to a motor. A tension means is provided, and the rollers press against each other. Bonding is accomplished by bringing the materials together and passing them between the rollers. The surface of the materials remains relatively cool as heat is conducted away by the mass of the rollers, while the interior becomes tacky and under the tension-applied pressure of the rollers, a bond is effected. The feeding action may be accomplished by the roller electrodes alone, or by auxiliary feed rollers. The cooling effect of the relatively massive electrodes may be augumented by liquid coursing through hollow electrode rollers. The power input, frequency, tension of the electrodes, and feeding speed are all adjustable and may be selectively varied, according to the nature of the material being bonded, between 5 and 150 watts, 10 and 100 megacycles per second, 25 to 300 pounds per square inch, and 20 to 50 inches of material per minute, respectively.

Spot welding may be accomplished, the application teaches, by using as one of the electrodes, a roller, the surface of which is not a continuous electrical conductor, but rather which consists of metallic projections interspersed with nonconducting material so as to form a smooth roller surface with spaced conducting areas located circumferentially on the surface. Each conducting area in the surface of that roller would in coming into position with the other electrode roller permit the high frequency electric field to exist at its maximum effective capacity. Then, as the roller revolved, that conducting area would move away tangentially from the surface of the other roller, interrupting or reducing the electric field. When successive conducting areas in the surface of the roller arrived and departed at the position of "contact" with the other roller, the high frequency electric field would vary from the maximum, at which bonding takes place, to a nonbonding minimum. In that

manner, spot bonding or spot welding of the material passing between the rollers can be effected.

All of the appealed claims are method claims drawn to the spot welding species of the method taught in the specification. In response to a requirement for division, apparatus claims were cancelled from the application at bar. Claim 14 is representative of the appealed claims, and reads: "14. The method of uniting a plurality of elongated layers of contacting, dielectric material at least one of which becomes tacky when heated to a certain temperature which comprises feeding said layers past an operating station while maintaining said layers in contacting relation, subjecting said layers to a high frequency electric field at said station whereby to create dielectric losses therein to thereby heat said layers, varying the effective intensity of said field between a relatively high value sufficient to heat said one layer to said temperature and a relatively low value insufficient to heat said one layer to said temperature by reason of the dielectric losses created therein in the course of feeding successive portions of said layers to said station whereby to heat to said temperature only those areas of said one layer which are subjected to said relatively high intensity electric field, cooling the relatively outer portion of at least said one layer simultaneously with the heating thereof whereby to confine the relatively hot portion thereof at substantially said temperature largely to a region of each of said heated areas which is contiguous to the contacting surfaces of said layers to thereby leave only substantially said regions thereof tacky, and applying pressure to said layers while said regions are tacky to cause them to adhere to each other at said areas."

The appealed claims—14 to 23, inclusive, and 46 to 49, inclusive—were rejected in the Patent Office as defining no patentable method steps over the following references in combination:

Johnston   2,322,298,   June 22, 1943.
Strickland   2,354,714,   Aug. 1, 1944.

Johnston's patent covers a machine with a feed dog similar to that found on sewing machines as a means for moving material intermittently past an operating station. The machine has an anvil and a cooperating reciprocating plunger, both of which are heated inductively by electrical elements in which they are encased. When overlapped material, one layer of which at least is thermoplastic, feeds through the machine and stops in its intermittent movement, the plunger moves toward and against the anvil impinging upon and heating the surface of the material between them sufficiently for it to become tacky, and simultaneously bonding the layers together by means of the pressure of the plunger against the anvil. Thus the material to be bonded moves through the machine, pausing intermittently while the reciprocating heated plunger in cooperation with the heated anvil effects spaced bonds of the layers.

The patent to Strickland is directed to a method and apparatus of bonding or spot welding together under pressure materials which are dielectric and thermoplastic by passing overlapped sheets between electrodes connected to a high frequency electric current source. The electrodes "may be of any desired shape," are water cooled so as to conduct heat away from the surface of the material being bonded, may be pressed against the work by "any convenient and known means," and if heating over a spot or small area is desired, may be "reduced in area" or "rounded to a hemispherical shape." The power absorbed from the high frequency current by the dielectric material between the electrodes softens the thermoplastic layers and the weld or bond is completed by the pressure of the electrodes each against the other.

Claim 14 recites a method which consists of five steps:

"1. Feeding contacting layers of dielectric thermoplastic material past an operating station;

"2. Subjecting the layers at that station to a high frequency electric field so as to heat the layers by the dielectric losses sufficiently to make the material tacky;

"3. Varying in the course of feeding the material the intensity of the high fre-

quency electric field between values sufficient to so heat, and values insufficient to so heat the material;

"4. Simultaneously with the heating, cooling the outer surface of the material so as to confine the heat to the region of the contacting surfaces of the layers being fed so that such regions only are tacky;

"5. While the regions are tacky applying pressure to the layers so as to cause them to adhere to each other at the heated areas."

The board held that, as shown by Strickland, it was old to join thermoplastic materials together by heating them through the use of high frequency current, and it would not be inventive to substitute that method of heating for the inductive heating of Johnston who taught the feeding of material, the use of heat to soften it, and of pressure to bond its layers together. That, said the board, is merely the substitution of one well known form of heating for another. Appellant contends the board is in error, and says that "it must be shown that the inventor's idea of means is indubitably revealed in the prior art and that such art discloses how to practice the invention." The appellant does not dispute that the mere substitution of one form of heating for another does not amount to invention where no new results are secured, but insists that "All of the steps of the method as claimed and the order in which they are recited must be disclosed in a single reference," before his method is properly anticipated. "In other words," contends appellant, "the conceptual idea of means, at least, must be anticipated, and the substitution of steps must be the substitution of equivalents."

The solicitor for the Patent Office takes the position, however, that it is unnecessary that elements of one reference be capable without modification of use in another so long as a mechanic would understand such modification as would be required and how to effect it, citing In re Ewald, 104 F. 2d 622, 26 C.C.P.A., Patents, 1312; In re Merkle, 150 F.2d 445, 32 C.C.P.A., Patents, 1151. The claims in issue in those cases were apparatus claims. Here the rejected claims are method claims.

The court has held that where rejected claims are directed to a method or process performed by the operation of the elements of an apparatus, the question for determination is not whether the apparatus and the method or process defined by the limitations of the rejected claims differ from the apparatus and process disclosed by the reference patent, but whether the respective processes in and of themselves are patentably different. In re Teter, 158 F.2d 1007, 34 C.C.P.A., Patents, 797. The court has also held that method claims may be anticipated by apparatus disclosed in references despite the fact that alterations of that mechanism would be required to carry out the method defined by the rejected claims, where those alterations are such as would have occurred to any person skilled in the art. In re Williford, 158 F.2d 997, 34 C.C.P.A., Patents, 812. If all the features of a rejected method claim are old, and if there is no invention in combining them in a single method or process, it is no defense that a number of references were used in rejecting the claims. In re Streckert, 167 F.2d 1010, 35 C.C.P.A., Patents, 1148. The fact that certain structural elements of the apparatus by which the processes of the reference patents are carried out differ in certain respects from those by which appellant carries out his method or process does not constitute the subject matter as patentable provided the cited patents suggest that which appellant has done. In re Dryer, 162 F.2d 505, 34 C.C.P.A., Patents, 1186. It is a matter of opinion whether anything more than the skill of an artisan was required to bring about the claimed result. In re Hoarney, 161 F.2d 271, 34 C.C.P.A., Patents, 968.

When we apply those principles of law to the case at bar, the following questions present themselves:

1. Do the references suggest doing what appellant accomplishes by his process?

2. Are the features of appellant's process old?

3. Was invention required to combine them in appellant's process?

4. Would alterations beyond the ken of an artisan be required to accomplish the appellant's process?

The reference Johnston teaches the employment of a feeding device to move layers of thermoplastic materials past an operating station where electrically induced heat is applied to the material by means of heating elements to effect with the pressure of those elements a bond or weld between the layers. The movement of the material is intermittent, and the heat is applied during the phases of the movement cycle in which the material is at rest. The references also teach (Strickland) that persons concerned with the welding or bonding of layers of thermoplastic materials may do so by the use of a high frequency electric field set up between electrodes which press against each side of the dielectric material to be bonded, the surfaces of the material being cooled with relation to the interior by means of the action of the water-cooled electrodes conducting heat away from the surface of the material. The formation of the bond is assisted by the pressure of the electrodes bearing against each other while separated by the material which has become tacky through the action of the heat generated from the power absorbed from the current by the dielectric.

In brief, Johnston's apparatus embodies a method of spot welding thermoplastic materials by the application of heat and pressure in the course of the intermittent movement of the material past an operating station. Strickland teaches a method of bonding such materials by the use of a high frequency electric field generating heat within the thermoplastic mass through the power absorbed from the field by the dielectric. Would an artisan be led by his skill and the knowledge of those references to do what appellant has done? So far as the references cited are concerned, we think that appellant's *apparatus* is patentable over that art. In particular, we think that appellant's roller electrodes which co-operatively supply pressure, feed the material, alternately establish and diminish a high frequency electric field to create the power loss generating heat in the dielectric, and cool the surface of the material being bonded, is an inventive concept. The claims at bar embrace operative features of appellant's apparatus. In so doing, do they recite a method, the features of which are anticipated by the prior art?

We have hereinbefore set out the five steps which comprise the method of claim 14. Of those steps, the second and fourth are taught by Strickland, and the first and fifth by Johnston. Is step three disclosed or suggested in the references? Strickland alone does not teach feeding the material. He does teach the making of a single spot-bond. The use of Strickland to make a series of bonds would require the material *or* the electrodes to be moved, but there is no suggestion in the patent that either be done. It cannot be said that Strickland's patent covers a method of bonding material in the course of feeding the material. Johnston teaches feeding the material with an intermittent movement. If Strickland's high frequency electric field method of heating the material be substituted for Johnston's inductively heated anvil and plunger, would step 3 result? There would then be a feeding of the material, and when the reciprocating electrodes came together against the material, a bond would be formed. The solicitor's position is that the reciprocating movement of the electrodes bringing them together when the material is at rest and moving away from each other as successive portions of material are "fed" through the apparatus would inherently cause a variation in the intensity of the high frequency electric field from maximum strength while the electrodes were pressing against the material to progressively diminishing strengths while the electrodes moved away from each other. Appellant asserts that such a method is not varying the intensity *in the course of feeding* the material.

■ We think appellant is correct. If electrodes connected to a high frequency generator were substituted in Johnston's apparatus for the inductively heated anvil and reciprocating plunger (with the minor alterations required to make the resulting apparatus operative), the high frequency

electric field would be at the strength sufficient to bond when the electrodes were pressing against either side of the material. The material, in Johnston's device, is then *at rest*—as it must be if the reciprocating heating elements are to press against the material so as to assist in forming the bond by the pressure applied while the material is tacky, and to conduct heat away from the surface of the material. *Before* the material can be moved so that another portion will come between the range of the reciprocating electrodes, the electrodes must move apart. The material does not move until after the electrodes move away from its surface. At that time the high frequency electric field is reduced from its maximum which existed when the electrodes were at their closest position pressing against the material. When the material *moves* so that a fresh portion moves into position between the electrodes, the high frequency electric field has already diminished from its maximum, sufficient to bond, to a lower intensity so that an apparatus combined from the references would not embody a method of operation wherein the intensity of the high frequency field varied *in the course of feeding* from a value sufficient to heat the material to a temperature where it becomes tacky, and values insufficient to so heat the material. Claim 14 by its terms applies only to a method which varies the intensity of the high frequency electric field *in the course of feeding* the material *from a high sufficient to render the material tacky* to a low insufficient to render the material tacky. In the sense in which "in" is used in claim 14, it appears to us to be equivalent to "during." It is in our judgment the peculiar excellence of appellant's invention that the electrodes of his apparatus are so adapted as to permit continuous feeding of the material during which the intensity of the electric field is varied so as to form spaced bonds or welds in the material. Claim 14 adequately states the method by which that result is accomplished.

To the questions posed by the principles of law reviewed, above, the answer must be that though features of appellant's process separately considered are old, the references do not suggest doing what appellant has done in his process, and invention—skill beyond the mere scope of an artisan's alteration of old elements merged in a single combination—was required in order to bring the method described by claim 14 into being. Claims 15 to 22, inclusive, are dependent upon claim 14, and their rejection on the basis of the references is likewise error.

Claims 23, 46, 47, and 48 are broader than claim 14 and do not mention varying the intensity of the high frequency electric field between a high value sufficient to heat the material to a tacky stage and a low value insufficient so to heat the material *in the course of feeding*. The claims do not express that relationship which separates the patentable method of claim 14 from the teaching of the references. We agree with the board that the method recited by claims 23, 46, 47, and 48 is anticipated by the references.

Claim 49 calls for varying the effectiveness of the field in order "to vary the heating effect" on the material, and feeding the material through the field while the effectiveness of the field is varied. The claim, unlike claim 14, fails to specify that the intensity varies during feeding between a value sufficient to heat the material *to a temperature where the material becomes tacky* and a value insufficient to so heat the material. Obviously the combination of references would yield a method where a variation in heating would occur after the electrodes moved apart and a fresh portion of the material was being fed into position. The moving apart of the electrodes would continue after the material began to feed into position and would "vary the effectiveness of the field," and "vary the heating effect" of the field. Claim 49 omits a feature essential to patentability, and is anticipated by the references.

For the reasons stated, the decision of the board is *modified*: *reversed* as to claims 14 through 22, inclusive; affirmed as to claims 23, 46 to 49, inclusive.

Modified.