**DOUDS v. LOCAL 1250, RETAIL WHOLE-SALE DEPARTMENT STORE UNION OF AMERICA, C.I.O., et al.**

No. 164, Docket 21216.

United States Court of Appeals
Second Circuit.

March 4, 1949.
Rehearing Denied April 26, 1949.

Neuberger, Shapiro, Rabinowitz & Boudin, of New York City (Leonard B. Boudin and Victor Rabinowitz, both of New York City, of counsel), for appellants.

Robert N. Denham, General Counsel, Bernard Dunau, Paul S. Kuelthau, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Samuel Ross, all of Washington, D. C., Attorneys, National Labor Relations Board, for appellee.

Poletti, Diamond, Freidin & Mackay, of New York City (Jesse Freidin, Sanford H. Kadish, of New York City, of counsel), for Oppenheim Collins & Co., Inc.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges

L. HAND, Chief Judge.

The respondents appeal from an order punishing them for disobedience of the injunction, which was recently before us upon appeal.[1] Our opinion in that case states enough of the facts to allow us to dispense with all that took place before the events which constituted the contempts whose punishment is here involved. The injunction was issued on September 14, 1948, and the respondents were fully advised of its terms; indeed the Local's attorneys took part in its drafting. On the same day these attorneys, acting for some 51 of the employees who had previously gone out on strike, demanded their reinstatement. The employer offered to take them back on their old terms and without loss of seniority as soon as there were any vacancies, but it refused to discharge those whom it had employed in their stead. On the 16th, and continually thereafter until the 24th, those of the 51 who had not been reinstated, together with other members of the Local, who had never worked for the employer, picketed its shops in New York and Brooklyn, carrying signs appealing to passers-by not to patronize it and demanding "reinstatement." The picketing went on in

---

[1] Douds v. Local 1250, 2 Cir., 170 F.2d 695.

front of the employees' entrances as well as the customers' entrances; the pickets distributed two leaflets which are set out in the margin;[2] they shouted "scabs" at employees, and to both them and customers they declared: "This is the last round to bust our union"; "the regular employees of Oppenheim Collins locked out for a living wage." On the 20th, agents of the Local visited an employee's home, asked her to join the union, to take part in the strike and to "respect" the picket line. Upon these facts the judge concluded that the Local's object was to force the employer "to recognize and bargain with the respondent, Local 1250, concerning reinstatement of striking former employees"; and that this was a violation of the injunction. He directed the Local and the other respondents, six of its officers, to purge themselves by complying with the injunction in various ways which he specified; he directed attachments to issue against the officers, if they failed to take the steps which he directed; and he fined the Local $20,000 if it also failed and $1,000 a day in addition for every day that its failure continued. In our discussion we shall speak only of the Local, because precisely the same considerations govern the disposition of the officers' appeals, as do that of the Local itself.

The first question is of the scope of the injunction; that is, whether it forbad the Local to represent the 51 employees in their efforts to be reinstated. If it

---

[2] "EMPLOYEES FIRED BY OPPENHEIM COLLINS:

Oppenheim Collins employees have been fired. We have been fired after a lifetime of loyal and faithful service at Oppenheim Collins. Some of us have been employed at Oppenheim Collins from the very days its doors opened for business.

HERE IS WHY WE'RE FIRED!

The Oppenheim Collins management refuses to agree to our fair and just proposals. The management openly proclaims that we have been replaced. They have replaced us with lower paid workers in order to increase their huge profits.

We seek reinstatement to our jobs without discrimination.

We seek the right to remain members of our Union.

We seek full right to seniority benefits.

AN APPEAL TO YOUR SENSE OF JUSTICE

As honest Americans, we shall never surrender our right to our jobs. We are fighting now to correct an injustice to ourselves and our families.

We appeal to you, the public. You can help us compel the Oppenheim Collins management to deal fairly with us. Help us secure a just settlement and full reinstatement to our jobs.

DON'T BUY AT
OPPENHEIM COLLINS!
SHOP WITH A CLEAR CONSCIENCE.
Issued by:
 Locked Out Employees of Oppenheim Collins, Members of Department Store Employees Union,

Local 1250, Independent
13 Astor Place, New York City

EMPLOYEES LOCKED OUT BY OPPENHEIM COLLINS

We are employees of Oppenheim Collins. We have been fired after loyal and faithful services, totalling hundreds of years. Some of us have been employed at Oppenheim Collins from the very day its doors opened for business.

We seek full reinstatement to our jobs. The management has replaced us with lower paid workers in order to increase their enormous profits.

As honest Americans, we shall continue our fight for justice as long as we have the strength to walk a picket line, distribute a leaflet and speak our minds freely.

WE TAKE COURAGE FROM THIS STATEMENT BY ABRAHAM LINCOLN

"All that harms Labor is treason to America. No line can be drawn between these two. If any man tells you he loves America, yet he hates Labor, he is a liar. If any man tells you he trusts America, yet fears Labor, he is a fool. There is no America without Labor."

We appeal to you, the public. Help us correct an injustice against ourselves and our families.

DON'T BUY AT OPPENHEIM COLLINS"

did, we should agree that the Local violated it, and was, at least formally, guilty of a contempt. Even so, we should be obliged to reverse the order, because, as we shall try to show, the injunction so construed would have been invalid. It is true that one who is enjoined may not excuse his disobedience because the injunction was invalid in so far as it covered the disobedience. However, such disobedience is a venial offence, and in the case at bar would not have deserved the punishment imposed. Indeed, to levy such large fines would in that event have been a plain abuse of discretion, of which there is not the slightest reason to suppose that the judge would have been guilty, had he not supposed that the Act, as well as the injunction, forbad the conduct. Nevertheless, in describing the "object" of any strike, or inducement to strike, which it forbad, the injunction did vary somewhat from the letter of § 8(b) (4) (C), National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (4) (C), for it phrased the "object" to include forcing the employer "to recognize or bargain with respondent as the collective bargaining agent of *any of* the employees" in the "unit." The interpolation of the words "any of" made this description, if read literally, cover the conduct of the Local. We do not think, however, that we are obliged to read them literally; they were certainly not intended to go further than the section, and we shall read them as limited by the limits which, as will appear, we find in it. So much for the question of interpretation.

Before interpreting § 8(b) (4) (C) itself, it is best to consider § 9(a), 29 U.S.C.A. § 159(a). The single proviso of that section, as it was in the National Labor Relations Act, merely declared that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer." It was possible to read this as meaning that "a group of employees" might adjust their "grievances" independently of any stipulations in an existing collective bargain between the employer and the certified agent of the "unit." However, as that obviously interfered with the finality of the certified agent's authority, the Board refused so to read it. The courts differed. The Ninth Circuit[3] decided that there was no escape from so construing it; but the Fifth Circuit held[4] that, although the proviso allowed, not only the "presenting" of "grievances" but their adjustment, "grievances" must be understood to be limited to questions of minor importance. That court, moreover, went on to say that, although an individual may ask an "experienced friend to assist him, he cannot present his grievances through any union except the representative." When the Labor-Management Act was in Congress, the Senate Report[5] declared that the "Board has not given full effect to this right"—that secured by the proviso of § 9(a)—"since it has adopted a doctrine that if there is a bargaining representative, he must be consulted at every stage of the grievance procedure, even though the individual employee might prefer to confer with his employer alone." The report then continued that the amendment made "clear that the employee's right to present grievances exists independently of the rights of the bargaining representative." Nevertheless the representative should be allowed to be present at the "adjustment" of the "grievance," if he wished; and the "adjustment" must not be inconsistent with the terms of any existing collective agreement. The amendment of the proviso, and the second proviso which was then added, were almost in the same words; they appear in the margin.[6] This amendment put an end to the distinction between

---

3 National Labor Relations Board v. North America Aviation, Inc., 136 F.2d 898.

4 Hughes Tool Co. v. National Labor Relations Board, 147 F.2d 69, 158 A.L.R. 1165.

5 Senate Report 105, 80th Congress, p. 24.

6 "Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment."

"grievances" and other disputes. It may well be that it was proper to assume the existence of such a distinction, while the certified agent's powers and the powers of a "group" were mutually independent; but any such necessity disappeared as soon as the authority of the certified agent was made expressly paramount. It then became the natural understanding that those "grievances," which could be "adjusted," comprised all disputes which could be covered in a collective agreement; and that meant every kind of dispute, for all disputes can be covered by a collective agreement.

The purpose or scheme, as so amended, seems to us consistent throughout. The certified agent's authority extends to all employees in the "unit," including those who have not voted for him; but his election and certification, as such, confer upon him only that authority; they do not, ex proprio vigore, affect the relations between the employer and the employees. They give him power to affect them by contract, but until he chooses to contract, and in so far as his contract leaves open any points in dispute, present or future, the employees retain their common-law right to bargain for themselves, singly or collectively. On the other hand, any bargain they may make is subject to his power to cancel it, for in so doing he acts for them as their agent, as much as though they had expressly authorized him to do so. His power to represent all within the "unit" is absolute and beyond question; but it does not automatically exclude them.

Whether a rival union may act for "a group" in the "adjustment" of a "grievance," is another matter. Obviously, the authority of such a union cannot extend to any member of the "group," who has not personally made it his agent, or to any subject matter which the union has not been specifically authorized to "adjust." The Act says nothing on the subject; if it bans a union, it is by implication, and we can see no basis for such an implication. It is true that such a "group" may select the certified agent to "adjust" the "grievance"; but they are expressly given the right to adjust "grievances" without his help; and we can see nothing to prevent their avail-

ing themselves of the best assistance they can obtain. The only reasons which have been suggested for implying that they may not retain a rival union as their assistant were those of the Fifth Circuit in the case we have cited. These were two: (1) that to allow a rival to represent the "group" would result in friction between it and the certified agent; and (2) that while the National Labor Relations Act was in Congress there were deleted from the proviso the words: "through representatives of their own choosing." There was indeed some reason to apprehend friction under the original act: at least if it were read, as the Fifth Circuit read it. The certified agent's authority was not final; jurisdiction was divided between him and a "group" by whatever was the line between "grievances" and other demands. Under the present act, on the other hand, the certified agent has it always in his hands to take over the "adjustment" of any "grievance," whether it has been already "adjusted," or is in process of "adjustment," and by including it in a collective agreement with the employer, finally to dispose of it.

Whatever friction remains will arise from the possible presence of the certified agent at the negotiations which lead up to an "adjustment" which a rival union is conducting for a "group." No one can deny that possibility, but some measure of friction appears to us inevitable, once the right granted by the proviso is conceded. Nobody will argue that, as a condition of "adjusting" a "grievance," a "group" must sever their relations with a rival union of which they were members; or that they must refuse its advice or assistance; or that the rival may not pay the expense of retaining an indifferent attorney to represent the "group." If the Act by implication bans an outside union, it is its actual conduct of the "adjustment," and nothing more. After all, § 2(5) defines a "labor organization" to include "any agency or employee representation committee * * * which exists for the purposes * * * of dealing with employers concerning grievances" and other demands; and it is at least arguable that any "group," organized to "adjust" a "grievance," become, as

such, a union. Be that as it may, we cannot take seriously the difference in resulting friction between letting the union, or its lawyers, conduct the actual negotiation, and requiring the employees to keep going back and forth for advice and counsel between the employer and the union as the negotiation proceeds. Indeed, it is quite possible that the second would be the most irritating kind of "adjustment." Moreover, it would prove most confusing in application, for the question would be constantly arising just what degree of intervention in the adjustment brings the union out of the wings and upon the stage.

As to the other ground—the deletion of the words we have quoted—the argument proves too much, or it proves nothing. We have already suggested the answer. Congress having expressly provided that a "group" need not "adjust" their "grievances" through the certified agent, meant either that they should have no representative except one of their number, or that they might choose one. Inexperienced persons are not adepts in labor controversies; there has grown up an elaborate system of law, complicated and technical, which demands special proficiency and training; the lower courts are by no means deft in deciding the controversies that arise, as the results prove. It seems to us incredible that Congress should have meant that an unassisted group of employees must shift for themselves in negotiating with their employer, who was free to protect himself by whatever armor the market afforded.

 If we are right in our reading of § 9(a), it would not have been an "unfair labor practice" for the employer to "adjust" the "grievance" of the 51 employees: i. e. their claim to reinstatement, through the Local's attorneys acting as negotiators; and if this is so, it was not an "unfair labor practice" under § 8(b) (4) for the Local to try to induce other employees to strike, as a sanction upon the employer to compel him to reinstate those employees. As we have already indicated, the right to bargain collectively and the right to strike and induce others to do so, are derived from the common-law; it is only in so far as something in the Act forbids their exercise that their exercise becomes unlawful.

Section 8(b) (4) does indeed forbid their exercise, for it makes a strike, and an inducement to strike, an "unfair labor practice"; but it does so only in case the conduct is to realize one of the four "objects," defined in subsections (A, B, C and D), of which (C) is the only one relevant here. The object, as there defined, is to force an employer "to recognize or bargain with a particular labor organization as the representative of his employees," when there is a certified agent. In order to bring an inducement to the other employees to strike within this language in the case at bar, we must read the words "the representative of his employees" to include a representative chosen by a "group" to "adjust" a "grievance" which has not been covered by any collective agreement. If the phrase means a "representative of any of his employees for any purpose," that would be true; but in that event it would run counter to whatever common-law rights the proviso to § 9(a) has taken out of the purview of the Act. Subsection (C) must, of course, be read, so far as possible, consistently with the proviso; and, if we are right in our construction of § 9(a), it does not deprive a "group" of the right, guaranteed by the proviso, to be represented by a union upon matters dehors the collective bargain. A reconciliation of the two appears to us easy. The purpose of subsection (C) was to protect both the certified agent and the employer from interference by an outside union in the discharge of the certified agent's bargaining authority; but in so far as he has not exercised it, the relative rights of employer and employed remain what they were, including the right of the employed to choose whom they will to represent them. Read thus, what § 8(b) (4) (C) forbad in the case at bar was: striking or inducing others to strike, (1) in order to force the employer to recognize the Local as the bargaining agent for the "unit"; or (2), in order to force the employer to "adjust" any "grievance" which the certified agent had already "adjusted" by a collective agreement. Neither of these were proved against the Local. So far as appears, no collective agreement of any kind had ever been made; and at least, if there was one, it had not "adjusted" the ques-

tion of the reinstatement of those of the 51 employees who had not been taken back. The Eighteenth Finding is the only one which can possibly bear upon the relevant issues; and it will not serve. It merely declares that the Local's object was to secure the reinstatement of those employees who had not been reinstated. Perhaps the Local expected and hoped to do more; perhaps out of the turmoil, agitation and ill feeling which the picketing would inevitably engender, it thought that it might displace the certified union, though it is hardly possible that it expected itself to succeed it in view of the decision of the Supreme Court in National Maritime Union v. Herzog.[7] However, we need not concern ourselves with such speculations; the judge did not find that the Local harbored such a purpose, and there would have been little, if any, basis for it, if he had. On the record as it stands, it appears to us that, until the certified union had "adjusted" the question of "reinstatement," the Act did not take from the 51 members the right to do what they did under the aegis of the Local. Possibly, that is a defect in the plan as a whole; but we think that Congress knew what it meant, and expressed it in what seem to us inescapable terms.

Order reversed; petition dismissed.

### On Petition for a Rehearing.

The Board and Oppenheim, Collins & Company have filed briefs, asking that we reverse our interpretation of the provisos to § 9(a). The gravamen of their argument is that in application our ruling will cause confusion in administration and introduce that strife between rival unions which it was one of the chief purposes of the Act to prevent. That may prove true; we were aware of the possibility, and mentioned it before; and it is indeed a circumstance not to be lightly dismissed in interpreting the statute. However, when the meaning is plain, as we think it is, the argument comes to no more than that, in granting to minorities the measure of individual representation which it did, Congress clogged, and perhaps even frustrated, the ven-

ture as a whole. And in this connection it is most important to observe that all the arguments, now so fervently propounded, the Board propounded with equal fervor to the Senate Committee when the new Act was before it,[1] and when the provisos were the same, ipsissimis verbis, as they eventually emerged. Obviously, Congress, for the sake of the limited minority representation which it granted, was willing to accept the chance that the Board might be right. That choice it is not for us to review.

Specifically the Board's argument is that the distinction between "grievances" and the stipulations appropriate to a collective bargain was well fixed in the law of this subject; and that it was carried over into the amended Act, which, as both parties appear to think, was written with the decision in mind of the Supreme Court in Elgin, Joliet & Eastern Railway Co. v. Burley et al.[2] Curiously enough, so far as concerns the actual holding in that case, it rather confirms our view than otherwise, for it denied power to the certified agent to settle the claims of individual members for violations of a collective agreement. It is true that in his opinion Rutledge, J., did distinguish "grievances" from those matters with which collective agreements deal. 325 U.S. at pages 723, 724, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886. However, although he mentioned among "grievances" complaints founded upon an employer's failure to observe the terms of an existing collective agreement, he also included disputes for which the agreement did not provide—"an omitted case." Indeed, had he not so enlarged the term, although the interpretation would of course have been authoritative as to the Railway Labor Act of 1934, 45 U.S.C.A. 151 et seq., it could not have been so as to the provisos of § 9(a), because these plainly presuppose that a "grievance" may not have been covered by the collective agreement, and indeed, that there may not be any such agreement in existence. Once it be conceded that "grievances" do cover disputes which no collective agreement has attempted to settle, it becomes to the last degree difficult to draw

---

[7] 334 U.S. 854, 68 S.Ct. 1529.

[1] Senate Report 105, 80th Congress, p. 24.

[2] 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886.

the line, if there be a line, between "grievances" proper, and those other disputes which are not "grievances." It was on this account that we said before that the provisos include any disputes, which no existing collective agreement has settled. If that be not true, there will emerge in every case a question perplexing, and pregnant with controversy, which will be as troublesome as any of the evils of which the Board complains. However, since it is never desirable for a court to go beyond what the decision demands; and, since all that the case at bar does demand is to decide whether the reinstatement of the employees at bar was a "grievance," we will confine our decision to that issue; and will let it be understood that we do not finally commit ourselves upon the proposition which we announced before and have just restated. Assuming then, arguendo, that in the case of every dispute there must be a piepowder determination, ad hoc, whether it involves a "grievance," we are to say whether the reinstatement at bar is a "grievance."

We cannot see how it can fail to be, unless the term is to be confined to such complaints as the oppression of foremen, the unfair distribution of the work, or other details of factory management. That it cannot be so confined follows from the fact that under the first proviso a "grievance" may be a dispute which conflicts with the collective agreement. The Board protests that the reinstatement of aggrieved employees cannot be considered as though it stood in vacuo, for it may disturb the relations of the employer with other employees, or the relations of those employees with the aggrieved employees themselves. That is true; any industrial establishment is, as it were, an elastic medium, which transmits everywhere a disturbance originating in any part. That may be a good objection to the procedure set up; but it is a reason which applies to the adjustment of any "grievance" whatever. No doubt, it was the recognition of this which caused the addition of the second proviso giving the certified agent the right to intervene whenever the proposed adjustment would be inconsistent with an existing collective agreement. If, as the Board argues, that gave an employer an opportunity to "play off" one faction against another, it also gave the certified agent an opportunity by exercising his paramount authority, backed by the formidable sanctions at his command, to insure the unimpeded performance of any collective agreement. We hold that, whatever the overall scope of the term may be, the reinstatement of these employees was a "grievance" within the first proviso.

There only remains the question whether an individual employee or a minority—a "group"—must negotiate the adjustment of their "grievance" without the help of a union which it has been their custom to use as their representative. We have little to add to what we said before. Behind the whole Act, indeed, its main presupposition, is the assumption that in industrial negotiations an individual, or a minority, does not bargain on equal terms with an employer. It is not reasonable to suppose that Congress, after giving a minority this privilege, should wish to deprive it of that means of exercising it, which for this reason is the putative condition of its effective use. But that is not all. The present Act provides for the intervention of the certified agent, and he will seldom, if ever, intervene if he is in sympathy with the minority's "grievance"; for if he is, they are likely to ask him to do the "adjusting." Hence they will ordinarily be called upon to face two opponents, each better qualified in such negotiations than they. It appears to us extremely unreasonable to impute that purpose to Congress. To match these considerations the Board invokes the fact that, while the original Act was before Congress, it struck out from the proviso, as it then was, the clause: "of their own choosing." That was done, so far as one can now tell, because it was feared that a "group" might use a "company union" as its representative. The deletion is not a safe guide in the interpretation of the amendment unless we recall the content of the original proviso. It had even been debated whether that gave employees any further privileges than to "present" their "grievances"; but if it did—and the better opinion would appear to be that it did—

it was left uncertain whether the adjustment had to be consonant with any existing collective agreement. Perhaps that too was to be implied, but it was not plain. At any rate the original proviso gave the certified agent no right to appear, not only to protect the agreement if one existed, but —what is far more important—to protest that the whole issue was a covert attempt to infiltrate the influence of a "company union." No such possibility any longer exists; and we cannot believe that the deletion of the clause from the original proviso is valid evidence of the purposes which dictated the amendment. Finally, we note that, after the Elgin case, supra,[3] the Attorney General reached the conclusion under the Railway Labor Act of 1934,[4] that the minority might make use of a union as its representative.

Petition denied.

---

[3] 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886.

[4] 40 Opinions of the Attorney General, No. 116.