WEST TEXAS UTILITIES CO., Inc. v.
NATIONAL LABOR RELATIONS
BOARD.

No. 10465.

United States Court of Appeals
District of Columbia Circuit.

Argued March 25, 1953.

Decided April 28, 1953.
Writ of Certiorari Denied Oct. 19, 1953.
See 74 S.Ct. 70.

Winthrop A. Johns, Assistant General Counsel, National Labor Relations Board, Washington, D. C., for National Labor Relations Board.

Thurman Arnold, K. Norman Diamond, Washington, D. C., and Frank Cain, Dallas, Tex., for Price Campbell and West Texas Utilities Company, Inc.

Louis Sherman, Washington, D. C., for intervenor, International Brotherhood of Electrical Workers, Local Unions No. 898, 920 and 1044, AFL.

Before EDGERTON, WILBUR K. MILLER and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

Voluminous pleadings supported by affidavits and argument trace the long trail which led an unhappy labor-management relationship to these civil contempt proceedings against the employer, West Texas Utilities Company, Inc., and Price Campbell, its President[1] (respondents). The trail reaches back almost seven years to 1946 when the National Labor Relations Board, pursuant to an election, certified the International Brotherhood of Electrical Workers, Locals No. 898, 920, and 1044, AFL, (the Union) as the exclusive bargaining representative for a unit comprising some 276 of the Company's employees. On July 10, 1950, this court affirmed a Board determination that the Company had refused, in violation of § 8(a)(5) of the Labor Management Relations Act, to bargain collectively with the Union.[2] Our decree dated July 24, 1950 enforcing the Board's order was issued on June 5, 1951[3] and directed the Company and its officers to

"1. Cease and desist from:

"(a) Refusing to bargain collectively with International Brotherhood of Electrical Workers, Locals No. 898, 920, and 1044, AFL, as the *exclusive representative of all employees* in the [appropriate unit involved here] * * *; and

"(b) Interfering in any other manner with the efforts of [the Union] to bargain collectively on behalf of the employees in the * * * bargaining unit.

1. The National Labor Relations Board petitioned for adjudications of civil and criminal contempt against respondents for failing to comply with a decree of this court. Following the filing of oppositions and supporting affidavits by respondents, we issued an order on February 13, 1953, to answer and show cause why they should not be adjudged in civil contempt, and deferred consideration of the request for an adjudication in criminal contempt pending further order of the court. An oral argument was had on the issues framed by the answers and replies of the parties.

2. West Texas Utilities Co. v. National Labor Relations Board, 1950, 87 U.S. App.D.C. 179, 184 F.2d 233, certiorari denied, 1951, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366 (overruled in part on grounds not pertinent here, Bethlehem Steel Co. v. National Labor Relations Board, 1951, 89 U.S.App.D.C. 122, 191 F. 2d 340), rehearing denied, 1951, 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637.

61 Stat. 140 (1947), 29 U.S.C.A. § 158 (a) (5): "It shall be an unfair labor practice for an employer— * * * to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." See note 15, infra.

3. Certified copies of the decree and related opinion were issued after the Supreme Court's denial of certiorari on May 28, 1951, 341 U.S. 939, 71 S.Ct. 999, 95 L. Ed. 1366. We denied a Company motion to recall the decree and opinion on July 2, 1951, and the Supreme Court denied a similar motion on July 10, 1951. The Company's petition in September 1951 for rehearing on its application for certiorari was denied on October 8, 1951, 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637.

"2. Take the following affirmative action which the Board has found will effectuate the policies of the Act:

"(a) *Upon request, bargain collectively with [the Union] as the exclusive bargaining representative* of all employees in the aforesaid bargaining unit, *with respect to wages, rates of pay,* hours of employment, and other conditions of employment, and, if an understanding is reached, embody such understanding in a signed agreement;

"(b) Post in its district and branch offices * * * copies of the notice attached hereto and marked Appendix A. Copies of said notice * * * shall * * * be posted by the petitioner [Respondent-Company] immediately upon receipt thereof and maintained by it for a period of sixty (60) consecutive days thereafter in conspicuous places, including all places where notices to employees are customarily posted. *Reasonable steps shall be taken by the petitioner [Respondent-Company] to insure that said notices are not altered,* defaced, or covered by any other material * * *." [4]

Board charges that respondents violated this decree gave rise to these proceedings. Pleadings developed certain hotly disputed matters and freed others from doubt or controversy. Since admitted matters clearly sustain charges of civil contempt, a trial of the disputed issues is unnecessary.[5] Upon the admissions we make the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The decree of this court dated July 24, 1950, was directed against respondent West Texas Utilities Company, Inc., and its officers.

2. Respondent Price Campbell, at all times herein material, has been President of respondent West Texas Utilities Company, Inc. He appointed a committee composed

of, *inter alios,* one Harold [D.] Austin, to negotiate with the Union on all matters involving the Company and retained power to ratify the committee's recommendations, agreements, proposals, or contracts.

3. On or about August 10, 1951, respondent Company posted the notice to all employees required by paragraph 2(b) of the court's decree. This notice (the *first* notice) read in pertinent part:

"Appendix a
"Notice to all Employees
"Pursuant to

"A decree of the United States Court of Appeals for the District of Columbia Circuit enforcing an order of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, we hereby notify our employees that:

"*We will bargain collectively* upon request *with International Brotherhood of Electrical Workers, Locals No. 898, 920, and 1044, AFL, as the exclusive representative* of all employees in the bargaining unit described herein *with respect to wages, rates of pay,* hours of employment, and other conditions of employment, and if an understanding is reached, embody such understanding in a signed agreement.[6]

\* \* \* \* \* \*

"We will not in any manner interfere with the efforts of [the Union] to bargain collectively with us as the exclusive representative of the employees in the appropriate unit described above.

"West Texas Utilities
Company Inc.
(Employer)"

4. Six days later, on or about August 16, 1951, respondent Company posted another notice alongside the required *first* notice. This notice (the *second* notice) read in pertinent part:

---

4. Emphasis supplied.

5. Reliance Mfg. Co. v. National Labor Relations Board, 7 Cir., 1944, 143 F.2d 761, 763. And see National Labor Relations Board v. Bank of America National Trust & Savings Ass'n, 9 Cir., 1945, 147 F.2d 287; National Labor Relations Board v. Tupelo Garment Co., 5 Cir., 1941, 122 F. 2d 603.

6. Emphasis supplied.

"Notice to all Employees

"*A routine form notice* [7] *provided by the Labor Board and required to be posted by this company gave no explanation as to its why-for.* Some of us have requested information as to why it was necessary, and I am sure others are wondering. We have received following information from attorney:

" * * * Out of over 80 unfair labor practices charged against this company by [the] union, the Company was completely exonerated of every one of them except one which is in doubt at the present time, both before the courts and the labor board. * * * Our company won every one of its points as against the union, *but because of * * * one technicality on timing not finally settled in our case by either the Labor Board or the Court, the Company is now for the time being compelled to start bargaining in good faith with such union.* OUR CASE AND THE QUESTION IS, HOWEVER, STILL BEFORE THE COURT FOR FINAL DETERMINATION.

"The U. S. Supreme Court recently held in a similar case, the Highland Park Case Number 71 S.Ct. 758, that such company did not have to bargain with a union which had not then signed the non-communist oath. *If such a court finding is finally held in our case,* there would have been no unfair labor practice of refusing to further bargain with a union, and the employees petitions therefore would be binding on the Labor Board for proper action."

"(Signed) *Harold D. Austin*" [8]

5. On and after August 8, 1951, bargaining sessions pursuant to paragraphs 1 (a) and 2(a) of the decree took place between respondent Company and the Union. No agreement was reached between the Company and the Union with respect to wages and rates of pay.[9]

6. On March 25, 1952, one Maurice V. Brooks, an attorney not connected with the Union but claiming to represent a large number of respondents' employees, requested a meeting with respondent Price Campbell to negotiate an adjustment of wages for respondent Company's employees "in accordance with the terms of Paragraph 9(a)" of the Act.[10]

7. On March 26, 1952, respondent Price Campbell, after consultation with respondent Company's attorneys, wrote Brooks that he understood the Company was compelled to negotiate with him "on the matter of wages to certain of our employees."

8. On March 28, 1952, the respondent Company met with Brooks and negotiated an agreement providing an 18 cents per hour average increase in wages for 205 of the 276 employees in the bargaining unit covered by this court's decree.[11]

### Conclusions of Law

1. Respondents West Texas Utilities Company, Inc., and Price Campbell, its President, have at all times herein material been subject to this court's decree, and both are liable for any failure to comply therewith.[12]

2. By posting the *second* notice, respondents disobeyed, disregarded and violated paragraph 2(b) of the decree which expressly ordered the Company and its officers to take "reasonable steps" to in-

---

7. It is undisputed that this referred to the *first* notice.

8. Emphasis supplied. Harold D. Austin was a member of the negotiating committee appointed by respondent Price Campbell.

9. The Company's highest offer to the Union was an average increase of 14 cents per hour.

10. See note 15, infra.

11. This agreement was put into effect retroactive to March 11, 1952.

12. For the liability of an important corporate officer, see National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 1939, 104 F.2d 302, 304–305, and cases cited therein.

sure that the *first* notice is "not *altered* * * *." [13] The *second* notice altered the *first* in important respects by erroneously implying that (1) the *first* notice did not explain its "why-for"; (2) the order of this court was not yet final; and (3) the Company was only required to bargain with the Union "for the time being." Its over-all effect "leave[s] a reader with quite a different impression than that" intended by the *first* notice.[14]

3. Section 9(a) of the Act makes a duly certified union the exclusive bargaining representative for all employees of an appropriate unit with respect, *inter alia*, to "rates of pay, wages, hours of employment, or other conditions of employment" although it permits "any individual employee or a group of employees * * * to present *grievances* to their employer and to have such *grievances* adjusted * * * without the intervention of the [exclusive] bargaining representative."[15] Although any grievance may be a subject of collective bargaining, not all subjects of collective bargaining are grievances. As we view the word "grievances" it does not encompass, for example, the setting of wage rates for a large percentage of the employees in a certified bargaining unit. The word "grievances," in the field of industrial relations, particularly in unionized companies, usually refers to "secondary disputes in contrast to disagreements concerning broad issues such as wage rates, hours and working conditions." [16] The Supreme Court, in constru-

13. The Board's petition alleged that respondents' *second* notice was evidence of their refusal to bargain in accordance with paragraphs 1(a), (b) and 2(a) of the decree. No direct charge was made that the *second* notice constituted a violation of the notice-posting requirements in paragraph 2(b). Matters pertinent to such violation, however, were covered in the pleadings and argument of the Board, intervenor Union and respondents. Apparently because it was so clear that a violation of paragraph 2(b) was in issue, respondents filed a response with the leave of court after submission of the case to a "memorandum of reply of the intervenor regarding the issues framed by the pleadings." Significantly, they did not ask for further opportunity to meet that issue before decision. They merely relied upon a lack of *formal* notice charging a paragraph 2(b) violation in order to claim that an adjudication of that issue would deprive them of due process. We reject this claim as hollow. First, because it clearly appears from all the circumstances that respondents had *actual* notice; and second, because our adjudication of that issue rests solely upon admitted acts without regard to the intent with which they were done. (See text and notes 26 and 27, *infra.)* Hence, respondents cannot claim prejudice. See Kuhn v. Civil Aeronautics Board, 1950, 87 U.S.App.D.C. 130, 132–133, 183 F.2d 839, 841–842, and notes 3 and 4 therein; Parker v. United States, 1 Cir., 1942, 126 F.2d 370, 381.

14. National Labor Relations Board v. Trojan Powder Co., 3 Cir., 1943, 135 F.2d 337, 340.

15. Emphasis supplied. 49 Stat. 453 (1935), 29 U.S.C.A. § 159(a) as amended, 61 Stat. 143 (1947), 29 U.S.C.A. § 159(a): "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment."

16. Lester, Economics of Labor 626 (1947). For general discussion of the term "grievances" as used in *unionized* companies, see e.g., Chamberlain, Collective Bargaining 96–119 (1951); Kaplan, Making Grievance Procedures Work 1, 5 (1950); Shulman and Chamberlain, Cases on Labor Relations (1949); Jacob, Problems in Handling Grievances 275 (1947); Lapp, How to Handle Labor Grievances (1945); and Settling Plant Grievances, 60 Dep't. Labor Bull. 1–6 (1943). For discussion of the term "grievances" as used in *non-unionized* companies, see National Industrial Conference Board, Inc., Grievance Proce-

ing the Railway Labor Act of 1934,[17] noted that grievances are of a "comparatively minor character" and traditionally "affect the smaller differences which inevitably appear in the carrying out of major agreements and policies *or arise incidentally in the course of an employment*."[18] The Fifth Circuit took a similar view in construing § 9(a) of the National Labor Relations Act.[19] Nothing in the legislative history indicates that Congress intended to give "grievances" a different meaning in § 9(a) of the Labor Management Relations Act.[20] Consequently we are not persuaded by the dictum of the Second Circuit in Douds v. Local 1250 that § 9(a) of the Act "put an end to the distinction between 'grievances' and other disputes."[21] And that court,

upon a petition for rehearing, specifically said, "we do not finally commit ourselves upon the proposition * * *."[22] Implicit in that proposition is this unseemly notion: Congress intended § 9(a)'s "grievances" proviso to abrogate the very rights bestowed by the dominant portion of that section and protected by §§ 8(a)(5) and 8(b)(4)(C).[23] Thus, to affirm that proposition would make meaningless the term "*exclusive*," and the whole ritual of election and certification, by allowing an employer to bargain as to everything not only with the so-called "exclusive bargaining representative" but with anyone else. It would obliterate the significant differences between a union certified as *exclusive* bargaining representative and a non-certified

---

dures in [57] Nonunionized Companies 6 (Studies in Personnel Policy, No. 109, 1950) which defines "a grievance to be any condition in the [non-unionized] company that the *employee* thinks or feels is unjust or inequitable." [Emphasis supplied.] Note that even in non-unionized situations the term grievance appears to cover only individual, not large-group, complaints.

17. 48 Stat. 1185 (1934), as amended, 45 U.S.C.A. § 151 et seq.

18. Elgin, J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, 724, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (emphasis supplied).

19. Hughes Tool Co. v. National Labor Relations Board, 5 Cir., 1945, 147 F.2d 69, 72–73, 158 A.L.R. 1165; National Labor Relations Board v. North American Aviation, Inc., 9 Cir., 1943, 136 F.2d 898, is not to the contrary. It merely finds that "grievances" within the meaning of § 9(a) may arise either under a collective bargaining agreement or from matters outside such an agreement. It does not define the subject matter covered by the term "grievances" in either situation. For a discussion of "grievances" arising under a collective bargaining agreement, though not in connection with § 9(a), see National Labor Relations Board v. Standard Oil Co., 6 Cir., 1952, 196 F.2d 892; and Timken Roller Bearing Co. v. National Labor Relations Board, 6 Cir., 1947, 161 F.2d 949.

20. If the colloquy on the House floor between Congressmen Owen and Hartley concerning the unsuccessful Lanham amendment to § 9(a) discloses anything

on the point, it is a congressional intent to retain the traditional meaning of the term "grievances," 93 Cong.Rec. 3624–25 (April 17, 1947). And the references in Sen.Rep.No. 105, 80th Cong., 1st Sess., 24 (1947) (printed in Legislative History of the Labor Managment Relations Act, 1947, 430 (1948)) to cases cited in notes 18 and 19, supra, are not to the contrary.

21. Douds v. Local 1250, Retail Wholesale Department Store Union of America, C. I.O., 2 Cir., 1949, 173 F.2d 764, 768–769, 9 A.L.R.2d 685.

22. Id. 173 F.2d at page 772.

23. For the text of § 8(a) (5), see note 2, supra. 61 Stat. 141 (1947), 29 U.S.C.A. § 158(b) (4) (C) provides: "It shall be an unfair labor practice for a labor organization or its agents— * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * * forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title." And see 61 Stat. 140 (1947), 29 U.S.C.A. § 157 which provides in pertinent part: "Employees shall have the right * * * to bargain collectively through representatives of their own choosing * * *."

rival union or group. We therefore hold that fixing wages or rates of pay for a large percentage of the employees in a certified bargaining unit is not an adjustment of "grievances" within the meaning of § 9(a)'s proviso.

It follows that by bargaining with Maurice V. Brooks regarding wages and rates of pay for a large percentage of employees in the bargaining unit, respondents disobeyed, disregarded and violated both paragraph 1(a) of our decree, which directed the Company and its officers to cease and desist from refusing to bargain with the Union "as the *exclusive* representative of all employees" in the bargaining unit, and paragraph 2(a) of our decree, which directed the Company and its officers "to bargain collectively with [the Union] as the *exclusive* bargaining representative of all employees in the * * * bargaining unit, with respect to wages [and] rates of pay." By reaching an agreement with Brooks to alter wage rates, respondents further violated paragraphs 1(a) and 2(a) of the decree.[24]

■ Since respondents did not comply with the decree, we hold them in civil contempt of this court.[25] We do not decide whether their non-compliance was intentional. "This is a proceeding in civil contempt to obtain the benefits of a decree and not one in criminal contempt to hold the respondents guilty of a crime, and the question for decision is not one of the intent with which * * * certain acts were done."[26] Adjudications for civil contempt to protect the benefits of a decree do not depend on the state of mind of the contemnors.[27]

## Remedies

■ Judicial sanctions for civil contempt are aimed at "the requirements of full remedial relief. * * * and may entail the doing of a variety of acts"[28] "to coerce the [contemnors] into compliance with the court's order, and to compensate the complainant for losses sustained."[29] This requires that sanctions be adapted to the particular circumstances of each case.

We direct the respondents to

1. Withdraw forthwith from the agreement of March 28, 1952, with Brooks setting wages and rates of pay for employees in the bargaining unit;

2. Make no further payments of wages or rates of pay pursuant to said agreement with Brooks; but respondents may fix wages or rates of pay in any manner and amounts which would have been permissible under the Act and this Court's decree of July 24, 1950, if said agreement had not been made;

3. Post copies of the order to be entered pursuant to this opinion for the same time, and in the same manner and places as provided for the notice in paragraph 2(b) of the decree;

4. Pay all court costs and an amount adequate to compensate the Board for its costs and expenses, including salaries, in investigating, preparing and presenting the matters involved in these proceedings; the amount of such compensation to be determined upon proof submitted by the Board

24. Since we hold that respondents' activities with Brooks did not involve the adjustment of grievances, it is immaterial whether "the bargaining representative [the Union] has been given opportunity to be present at" the meeting with Brooks. Nor is it material that the Brooks agreement contains a provision designed to meet that part of § 9(a) which requires grievance adjustments to be "not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." See note 15, supra.

25. None of the telling considerations which impelled the court in National Labor Relations Board v. Reed & Prince Mfg.

Co., 1 Cir., 1952, 196 F.2d 755, 760–761, to deny a petition for adjudication in civil contempt are present in the instant case.

26. National Labor Relations Board v. Whittier Mills Co., 5 Cir., 1941, 123 F. 2d 725, 727.

27. McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 191–193, 69 S.Ct. 497, 93 L.Ed. 599.

28. Id., 336 U.S. at page 193, 69 S.Ct. at page 500.

29. United States v. United Mine Workers, 1947, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884.

when these proceedings are finally concluded;[30]

5. Make a return to this court within thirty (30) days after the date of the order to be entered herein, showing by transcripts, minutes of meetings with the Union as exclusive bargaining representative, letters or other matter, that respondents have brought themselves into compliance with the decree dated July 24, 1950, and with the order to be entered pursuant to this opinion. Upon such a showing, respondents will be purged of this contempt. Upon their failure to make such a showing, this court will deal further with the matter by imposing a compliance fine of $30,000.00 on respondent West Texas Utilities Company, Inc., and $15,000.00 on respondent Price Campbell and a further compliance fine of $1,000.00 a day on respondent West Texas Utilities Company, Inc., and $500.00 a day on respondent Price Campbell for each day of continued non-compliance thereafter[31] and by such other means as the court shall then determine.

The Board will submit on or before May 1, 1953 its proposal of an order to be entered in accordance with this opinion.

30. See United States v. United Mine Workers, 1947, 330 U.S. 258, 304–305, 67 S.Ct. 677, 91 L.Ed. 884.

31. Ibid.

32. See West Texas Utilities Co. v. National Labor Relations Board, 1950, 87 U.S.App.D.C. 179, 186, 184 F.2d 233, 240, and note 2 supra.
Respondents rely upon National Labor Relations Board v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, to urge that the decree does not proscribe the violations alleged in these proceedings since these violations are unrelated to the § 8(a) (5) violation which originally gave rise to the decree. We think the violations are related. Even if they were not, the Express Publishing case would be inapplicable. That case stands for the proposition that a decree *to be entered* enforcing a Board order must be related to the unfair labor practice which gave rise to that order. But here the Board is not seeking a decree to enforce its order but rather compliance with a *final* decree enforcing a Board order not now subject to review. Moreover, our decree was clearly related to the Company's vio-

It follows that respondents' counterclaim either to vacate our decree of July 24, 1950, or to remove it as a bar to holding an election, must be denied.[32]

So ordered.

WILBUR K. MILLER, Circuit Judge, dissents.

lation of § 8(a) (5) as found by the Board. Furthermore "[i]t does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned in Maggio v. Zeitz, [333 U.S. 56,] at page 69, 68 S.Ct. [401], at page 408 [92 L.Ed. 476]. The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught." McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 192–193, 69 S.Ct. 497, 500, 93 L. Ed. 599.