**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TANNER MOTOR LIVERY, LTD., Respondent.**

No. 19748.

United States Court of Appeals Ninth Circuit.

June 29, 1965.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Linda R. Sher, Attys., N.L.R.B., Washington, D. C., for petitioner.

Maxwell S. Keith, Cooper & Nelsen, Los Angeles, Cal., for respondent.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order which is based upon a finding that Tanner Motor

1

Livery, Ltd. has violated the National Labor Relations Act as amended. The specific charge is that Tanner discharged two of its employees "because they engaged in concerted activities for the purpose of persuading * * * [Tanner] to abandon its racially discriminatory hiring practices and its maintenance of a racially segregated working force." The Board's decision is reported at 148 NLRB No. 137.

The Board found that Tanner violated section 8(a) (1), 29 U.S.C. § 158(a) (1), which makes it an unfair labor practice to interfere with, restrain or coerce employees in the exercise of the rights guaranteed to them in section 7 (29 U.S.C. § 157). That section guarantees to employees "the right * * * to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." The trial examiner found that the two employees did engage in concerted activities for the purposes stated in the complaint and that they were discharged for that reason. However, he concluded that their activities were not protected by section 7 of the Act, basing his conclusion upon his belief that Congress did not intend section 7 to be applicable in this context. The Board disagreed and entered the order which it seeks to have enforced.

Tanner operates a taxicab service at Santa Monica, California, employing between 50 and 60 drivers, among whom there are no Negroes. It also operates taxis in other communities and in some of those does employ Negroes. The two employees in question, Abramson and Dorbin, were active in civil rights groups, and particularly those dealing with race relations in Santa Monica. They thought that Tanner ought to employ Negro drivers. On July 23, 1963, Abramson approached his immediate superior, Barrial, and asked if Barrial had any objection to employing a Negro. Barrial stated that he did not. Abramson inquired if Barrial would consider a named Negro for employment and Barrial agreed to see

that person, who called on Barrial on July 24 but was told that there was no opening. The same day, Barrial told Abramson that the company's director of labor relations in Los Angeles had told Barrial that Tanner had no objection to hiring a Negro. There was some discussion of a news broadcast dealing with Tanner's alleged lack of cooperation with civil rights organizations, but Abramson denied knowledge about it. Abramson then left and spoke to Dorbin, who had been preparing press releases for local civil rights organizations. As a result, Dorbin called upon Barrial, mentioned the broadcast, and stated that it was an error because Dorbin had prepared a release announcing that Tanner appeared to be acting in good faith.

On July 29 Abramson again went to see Barrial and was handed a discharge slip based upon two accidents that Abramson had had, one on July 24 and one on July 25. Following some discussion of the discharge, there was more discussion about the employment of Negroes and an explanation by Barrial as to why Tanner had not hired one. On August 1 Abramson picketed the Tanner office carrying a sign reading "Jim Crow Shop." After about an hour he was joined by other pickets representing civil rights groups. On August 6, when Dorbin finished his shift, he joined the picket line where he remained for 45 minutes, carrying a sign reading "American Civil Liberties Union Marches for Equality." That evening Dorbin received a telegram stating that he was discharged. However, he was reinstated the following day.

We do not detail the evidence. We have examined it, and we find that substantial evidence supports the trial examiner's conclusions, approved by the Board, that Abramson was actually discharged because of his activities in attempting to persuade Tanner to employ Negroes rather than because of the accidents, that Abramson and Dorbin were acting in concert, and that Tanner knew it.

Tanner's employees are represented by the Chauffeurs Union, Local 640, an affiliate of the Teamsters Union. Abramson took advantage of the grievance procedure established by a collective bargaining contract between Tanner and the Union, and a board consisting of two representatives of Tanner and two representatives of the Union voted to uphold the discharge. No arbitration of the dispute, however, was sought, and the record does not show whether the contract provides for arbitration.[1] A copy of the contract was not offered in evidence.

The principal questions in the case, we think, are two. (1) Does an attempt by employees, acting in concert, to persuade their employer to employ Negroes, fall within the protection of section 7? (2) If it does, can the employer, nevertheless, discharge employees who so act, or who picket in support of such activities, when there is an established collective bargaining representative having a contract with the employer and the employees do not act or seek to act through that representative? Stated another way, the second question is, to what extent does section 9(a) limit or remove the protection afforded by section 7? We answer the first question in the affirmative, but we remand to the Board for consideration of the second question, because we cannot find in the record any adequate consideration of that question and we think that it is an important one.

1. It is the position of the Board that efforts to secure racially integrated working conditions are a protected activity under section 7 of the Act. Section 1 of the Act (29 U.S.C. § 151) declares it to be the policy of the United States to encourage "the practice and procedure of collective bargaining and * * * [to protect] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." As we have seen, section 7, supra, specifically protects both the right to bargain collectively and the right to engage in other concerted activities and specifically distinguishes between the purpose of collective bargaining and the purpose of other mutual aid or protection. It seems to be agreed that, taken together, these provisions protect concerted activities, even though not through collective bargaining, which have to do with terms and conditions of employment.

The Norris-LaGuardia Act, prohibiting the issuance of injunctions in certain types of labor disputes, provides in section 13(c), 29 U.S.C. § 113(c), that the term "labor dispute" includes "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." In New Negro Alliance v. Sanitary Grocery Co., 1938, 303 U.S. 552, 561, 58 S.Ct. 703, 82 L.Ed. 1012, the Supreme Court held that the picketing of a grocery store in Washington, D. C., by an organization of Negroes, none of whom was an employee of the store, for the purpose of enforcing a request that the store employ Negro clerks, was an activity protected from an injunction by the Norris-LaGuardia Act. In so holding the Court said, speaking through Mr. Justice Roberts:

"The Act does not concern itself with the background or the motives of the dispute. The desire for fair

---

1. The Board held that the decision under the grievance procedure did not prevent it from considering the propriety of Abramson's discharge. It cites section 10(a) of the Act, 29 U.S.C. § 160(a). It says that the body that decided to sustain the discharge was not impartial, and that its procedure did not meet normal standards as to sufficiency, fairness, and regularity. Cf. NLRB v. Walt Disney Productions, 9 Cir., 1945, 146 F. 2d 44; Gateway Transportation Co., 1962, 137 NLRB 1763; Monsanto Chem. Co., 1961, 130 NLRB 1097. We think that its conclusions are supported by the record. Tanner does not attack them.

**4**

and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation. There is no justification in the apparent purposes or the express terms of the Act for limiting its definition of labor disputes and cases arising therefrom by excluding those which arise with respect to discrimination in terms and conditions of employment based upon differences of race or color."

■ We think that the foregoing language is equally applicable to the language of the National Labor Relations Act as amended, and that the matter with which Abramson and Dorbin were concerned does relate to terms or conditions of employment.[2] We think, too, that the activities of these two employees is both literally and legally concerted activity within the meaning of the Act. Compare NLRB v. Washington Aluminum Co., 1962, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298; NLRB v. Phoenix Mutual Life Insurance Co., 7 Cir., 1948, 167 F.2d 983, 6 A.L.R.2d 408; NLRB v. Guernsey-Muskingum Electric Co-op Inc., 6 Cir., 1960, 285 F.2d 8; International Ladies' Garment Workers' Union v. NLRB, 1962, 112 U.S.App.D.C. 30, 299 F.2d 114, ibid. sub nom., Walls Manufacturing Company, Inc. v. NLRB, 1963, 116 U.S.App.D.C. 140, 321 F.2d 753.

■ On the basis of the foregoing we are of the opinion that the activities of Abramson and Dorbin are protected activities within the meaning of section 7 of the Act, and that the Board is correct in so holding.

■ 2. We are also of the opinion, however, that the existence of a collective bargaining agreement between the employer and the Union raises further questions which were not given sufficient consideration by the Board and that those questions are of such importance that the Board ought to give consideration to them before requiring reinstatement of employees under such circumstances. It is quite clear that the, or a, principal purpose of the National Labor Relations Act, as amended, is to encourage the practice and procedure of collective bargaining. (Section 1, 29 U.S.C. § 151) To that end the Act sets up an elaborate procedure whereby a collective bargaining representative of employees can be identified and designated and then gives to such a representative a preferred status in dealing with the employer in relation to terms and conditions of employment. Section 9 of the Act, as amended, (29 U.S.C. § 159) provides in part as follows:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or group of employees shall have the right at any time to present grievances to their employer and to

**2.** The Board calls our attention to the fact that many collective-bargaining contracts now contain provisions against discrimination by reason of race: Consolidated Edison Co. of N.Y. and Utility Workers, clause II Collective Bargaining Negotiations and Contracts, BNA 55:12 (1–17–64); Hormel & Co. and United Packinghouse Workers, 1953 Agreement, Labor Law Reporter, Union Contracts-Arbitration, CCH ¶59,956, at 87,158, Memorandum of Understanding Item I; General Motors and United Auto Workers, 1964 Agreement, 57 LLR 230.

have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment."

It will be noted that the foregoing provision does reserve the right, both of an individual employee and of a group of employees, to deal with the employer in relation to grievances, albeit in a limited manner, without the intervention of the bargaining representative. It is at least arguable that the activities involved here go beyond the type of activities that the Congress intended to authorize by the first proviso above quoted. Cf. NLRB v. Lundy Manufacturing Company, 2 Cir., 1963, 316 F.2d 921, and cases there cited. It is quite customary for collective bargaining agreements to contain "no strike" provisions, provisions against picketing, requirements that disputes that may occur, including "grievances," are to be settled in a prescribed manner, and provisions for arbitration if the parties are unable to agree. If "grievances" is held to cover any complaint or request of the employees relating to terms and conditions of employment, there may develop a sort of continuous "collective-bargaining," under the guise of presenting grievances, that could be inimical to the effective operation of the collective-bargaining contract. If employees who thus present "grievances" to their employer may also resort to a picket line when

they think that the employer has not properly responded to their demands, the purposes of the Act might well be defeated.[3] There appears to be a difference between collective bargaining and presenting grievances, else why did the Congress limit the proviso in section 9(a) to grievances? Thus the desire of employees for non-discriminatory hiring, while a proper subject for collective bargaining, may not be a proper basis for a grievance. See: Elgin, Joliet & Eastern Ry. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886; Hughes Tool Co. v. NLRB, 5 Cir., 1945, 147 F.2d 69, 158 A.L.R. 1165; Douds v. Local 1250, 2 Cir., 1949, 173 F.2d 764; NLRB v. Lundy Manufacturing Co., supra; West Texas Utilities Co. v. NLRB, 1953, 92 U.S.App. D.C. 224, 206 F.2d 442; cf. NLRB v. Cabot Carbon Co., 1959, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175; NLRB v. Puerto Rico Rayon Mills, Inc., 1 Cir., 1961, 293 F.2d 941; Medo Photo Supply Corp. v. NLRB, 1948, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007.

We do not here hold that there may be no circumstances under which presenting demands or requests, or picketing, or both, by a group of employees, in support of a policy of non-discriminatory hiring, even where there is a collective bargaining agreement in force, may be a protected activity, at least to the extent that the employees cannot be discharged for it.[4] We think the question of whether there are such circumstances here is one that should be fully explored in the first instance by the Board, which is the expert body created by the Congress to administer the Act. We find nothing in

---

3. Compare cases that hold that a "wild cat" strike is not a protected activity when there is an established collective-bargaining relationship; NLRB v. Sunset Minerals, 9 Cir., 1954, 211 F.2d 224; NLRB v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 156 A.L.R. 989; Plasti-Line, Inc. v. NLRB, 6 Cir., 1960, 278 F.2d 482; New York Mailers' Union v. NLRB, 2 Cir., 1964, 327 F.2d 292. But see NLRB v. R. C. Can Co., 5 Cir., 1964, 328 F.2d 974.

4. NLRB v. Lundy Manufacturing Co., supra. We note that none of the cases on which the Board relies is one in which there was an established collective-bargaining contract between the employer and a union. Each, in this respect, resembles NLRB v. Washington Aluminum Co., supra, where it appears that the employees were "wholly unorganized" and "had no bargaining representative and, in fact, no representative of any kind to present their grievances to their employer" (370 U.S. at 14, 82 S.Ct. at 1103).

**6**

the Board's opinion indicating that it gave any attention to this problem. We think that it should do so.

We remand the matter to the Board, with directions to take such further proceedings as may be consistent with this opinion.