NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LUNDY MANUFACTURING CORPORA-TION, Respondent.

No. 27730.

United States Court of Appeals Second Circuit.

Argued March 27, 1963.

Decided April 26, 1963.

Hans J. Lehmann, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B.), for petitioner.

Harold Dublirer, New York City (Dublirer & Haydon, New York City), for respondent.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The National Relations Board asks us to enforce an order, 136 NLRB No. 128, made in a proceeding in which it consolidated a case against respondent employer relating to events in 1957 and 1958, which we had remanded, 286 F.2d 424 (2 Cir., 1960), with another case against the same respondent relating to events in 1960, which had then reached the stage of an intermediate report by an examiner. Our remand had directed the Board to give further consideration to its ruling in the earlier proceeding, 125 NLRB 1188 (1959), in the light of the intervening decision in Local Lodge No. 1424, I. A. M. v. N. L. R. B., 362 U.S. 411,

80 S.Ct. 822, 4 L.Ed.2d 832 (1960), which held that the six-month statute of limitations contained in § 10(b) of the National Labor Relations Act barred an unfair labor practice complaint based on a collective bargaining agreement executed more than six months before the complaint was brought. In response the Board revoked its findings in the remanded case that respondent had violated the Act by maintaining or giving effect to its 1957 contract with Amalgamated Local Union 355, and by executing and maintaining in effect, without terminating the 1957 agreement, the revised contract of July, 1958. However, the Board adhered to its findings that three employees had been discriminatorily discharged in 1958, in violation of § 8(a) (3) and (1), for supporting a rival union, the International Union of Electrical Workers, hereafter the IUE, and that these discharges and other action by respondent in that year constituted unlawful assistance to Local 355 in violation of § 8(a) (2). In the 1960 case the Board upheld the examiner's finding that Lundy had violated § 8(a) (1), (2) and (3) through conduct stemming from its refusal to deal in April, 1960, with an employees' grievance committee which it regarded as unduly influenced by the IUE; this led to what the examiner found to be an unfair labor practice strike and the consequent unlawful refusal to reinstate six strikers and discriminatory discharge of another. In addition to the usual cease and desist provisions and reinstatement requirements (both as to the employees discharged in 1958 and those discharged or not reinstated in 1960), the Board directed that Lundy refrain from recognizing Local 355 for any purpose unless and until that union shall have been certified by the Board as the exclusive representative of the employees.

 With respect to the findings in the 1958 case, respondent contends that the Board did not adequately respect our statement, 286 F.2d at 426, that:

"The Board also might treat the alleged discriminatory discharges

differently in a setting wherein the 1957 agreement with Local 355 was entitled to the benefits of the contract bar rule."

In argument respondent characterized this remark as a "mandate", but the language shows this was exactly what it was not; even in a judicial opinion, "might" does not mean "must." The Board was well within its powers in deciding that the legality of Lundy's contract with Local 355 did not justify discriminatory tactics against employees "in disfavor with the union because of activities protected by § 7." National Labor Relations Board v. Local 138, Int'l Union of Operating Engineers, 293 F.2d 187, 197 (2 Cir., 1961). Although there can be debate as to the reason for the discharges, especially Healy's, we may not enter into this area when, as here, the Board's findings are supported by substantial evidence on the record as a whole.

A good deal more needs to be said about the 1960 case. The facts as to the episode that sparked the trouble were reasonably found to have been as follows:

The contract of July 31, 1958, between Lundy and Local 355, effective until June 30, 1961, provided that "any dispute * * * between the Employer and the Union or concerning the interpretation or application of any provision of this agreement * * * shall first be taken up between a representative of the Union, one or more of the Union Shop Stewards and a representative of the Employer" and, if not adjusted, should be submitted to arbitration. Apparently pursuant to this provision, Local 355 had maintained a "grievance committee" in the shop, but the committee ceased to function in early April, 1960, when several shop stewards resigned from it. Shortly thereafter, on April 11, one employee complained about working conditions and a second, who intervened upon hearing that the complainer had been threatened with discharge if he went home, was himself fired for his pains. On the next morning, April 12, seven other employees protested by remaining in the company's parking lot to await

the arrival of the president, Barbato. The latter proposed that the employees select a committee to discuss the discharge and resume work in the meantime; upon meeting with the committee that morning, he reduced the discharge to a 1-day suspension and suggested that the employees elect a standing committee to handle future grievances. During the noon workbreak practically all the day-shift employees attended a meeting held at a hall rented by the IUE. They elected a committee of seven, two of whom were active members of IUE and one of Local 355; the IUE business representative attended the meeting but did not participate, except to state after the business was completed that he was sorry the employees were not seeking his leadership. That afternoon, when presented with the new committee, Barbato refused to recognize it because the members "were too much inclined to be in favor of the IUE"; he proposed that a meeting be held to "vote on a different committee, one that he would see fit to recognize," and that the meeting be held in the plant at the end of the day-shift so that the night-shift employees could also attend, which he would allow them to do on company time. The committee declined this offer, but held a meeting on the afternoon of April 18 at the outside hall, the rental being paid on this occasion by one of the committee members. Both shifts were invited but only workers on the day-shift attended, some 95 of the 120 employees being present; they unanimously backed the committee already chosen and voted to strike if it was not recognized. On the morning of April 19, Barbato again refused to recognize the committee; in the afternoon the employees again voted to strike. Meanwhile, on April 14, the company had posted notices announcing a meeting on the afternoon of April 19 for the employees to elect a grievance committee. This led to a visit to the plant on April 19 by the president of Local 355; he tore down the notices and advised some of the employees and the company that Local 355 already had a committee and would not

recognize any other. The strike started on April 20; it was only partially effective and ended on May 3—with, as the examiner was warranted in finding, one employee who reported for work during the strike discharged because of strike activities and IUE affiliations, and six strikers denied reinstatement. Meanwhile, Local 355 had called a meeting on April 21, attended by some 40 employees, at which another grievance committee was elected.

The examiner found that Lundy's acts violated § 8(a) (1) by denying the employees rights guaranteed by § 7, that the strike was thus an unfair labor practice strike, and that the discharge and refusals to reinstate thus violated § 8(a) (3) and (1). However, he did not fully spell out the reasoning underlying the first of these findings, which seems to have been influenced in substantial part by his conclusion—unwarranted, as matters turned out—that "under the Board's Decision and Order of December 29 [1959], there was no recognized bargaining representative of the employees, nor was any valid collective bargaining agreement covering the processing of grievances in effect at the time." He found the allegation that the discharge and refusals to reinstate had also violated § 8(a) (2) "redundant" in view of the same Order. The Board's opinion merely registered agreement with the examiner's findings in regard to the Section 8(a) (1) and (3) violations—although, in view of its own action with respect to the 1958 case, it could not reasonably have agreed with the passage just quoted. In addition it found "that the Respondent thereby gave continued substantial assistance and support to Local 355 in violation of Section 8(a) (2) of the Act, as also alleged"—without specifying what it meant by "thereby".

■ Lundy says it could not have violated § 8(a) (1) by refusing to recognize an elected grievance committee, which it considered to be under IUE influence, when a subsisting and valid collective bargaining agreement required it to handle grievances through Local 355.

In the light of the Board's own decisions in related contexts, denial of this claim warranted much more explanation than a one-sentence approval of an examiner's conclusion heavily resting on a premise the Board had destroyed.

 There can be no doubt that, as indeed was squarely held in National Labor Relations Board v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), the right of employees to join in protest over working conditions is one of the "concerted activities for * * * mutual aid or protection" guaranteed by § 7; moreover, § 7 recognizes the right of employees "to form, join, or assist labor organizations," and such organizations are defined by § 2(5) as including "any * * * employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances * * *." But the rights recognized in § 7 may be affected by a valid collective bargaining agreement; to deny this would be to ignore not only the exclusive-representation principle of § 9(a) but the whole policy of Congress, set forth in § 1, of "encouraging the practice and procedure of collective bargaining" and relying on such agreements for the maintenance of industrial peace—as the Board's contract bar rule, see Local 1545, United Bhd. of Carpenters v. Vincent, 286 F.2d 127 (2 Cir., 1960); National Labor Relations Board v. Marcus Trucking Co., 286 F.2d 583 (2 Cir., 1961), clearly recognizes. Since the employees in Washington Aluminum were unorganized, that case, heavily relied on by counsel for the Board, in no way holds that, despite the existence of a valid collective bargaining agreement containing a grievance procedure, an employer has a duty, or even a right, to recognize any other *representational* machinery for the handling of future grievances. It is true that valid recognition of a union and establishment of a contractual grievance procedure do not impair the right, ex-

pressly recognized in the proviso to § 9 (a), of "any individual employee or a group of employees * * * at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." [1] Moreover, it was held under this proviso, in its pre-Taft-Hartley form, that "an inexperienced or ignorant griever can ask a more experienced friend to assist him * *." Hughes Tool Co. v. N. L. R. B., 147 F.2d 69, 73 (5 Cir., 1945); see also National Labor Relations Board v. North American Aviation, Inc., 136 F.2d 898 (9 Cir., 1943). However, the Hughes Tool opinion went on to hold that, because "It was not thought good to allow grievance hearings to become clashes between rival unions," the employee cannot present his grievance through any union except the representative.

The sole decision pointing to a contrary conclusion, strongly pressed on us by counsel for the Board, is Judge Learned Hand's opinion in Douds v. Local 1250, Retail & Wholesale Department Stores Union, 173 F.2d 764, 770 (2 Cir., 1949), which held that it would not have been an unfair labor practice, under the circumstances there presented, for the employer to allow a defeated union to assist strikers seeking reinstatement, which the court considered a "grievance" under the § 9(a) proviso. But that holding, assuming its correctness, does not necessarily mean that it *would be* an unfair labor practice for the employer to *refuse* to deal with anyone other than the aggrieved employees on the one hand or their contractually authorized representative on the other; moreover, the opinion must be read in the light of its factual statement that not only was there no contractual grievance procedure established in the shop, but "So far as appears, no collective agreement of any kind [with the success-

I. This is subject to the further proviso "That the bargaining representative has been given opportunity to be present at such adjustment."

ful union] had ever been made." 173 F. 2d at 770. Furthermore, we think it relevant to note, though counsel did not bring this to our attention, that the enthusiasm for Judge Hand's opinion displayed in the brief and argument here does not appear to be shared by the Board itself. In Federal Telephone and Radio Co., 107 NLRB 649 (1953), the Board held it an unfair labor practice for an employer to entertain a grievance processed by a union other than the certified bargaining agent, and expressed its belief that the Douds opinion "read more than was warranted into the provisos in saying that they permit processing grievances through a rival union in spite of the existence of a certified union;" 107 NLRB at 653 n. 9; this refusal to follow Douds was explicitly adhered to in Meat & Provision Drivers Union, Local No. 626 (Lewis Food Co.), 115 NLRB 890, 892 (1956).[2]

The court decision we find most nearly in point is National Labor Relations Board v. Kearney & Trecker Corp., 237 F.2d 416 (7 Cir., 1956), not cited by either party. There the employer, which was refusing to recognize either of two rival unions while the validity of the certification of one was being contested in the courts, had informed its employees that during this period it would continue to entertain their grievances through the channels that had previously been established under a collective bargaining contract, but that the grievances must be presented individually and not through either union or any other group. When employees, led by two spokesmen who were officials of one of the unions, complained about their bonus pay and demanded that its computation be explained to them as a group, the company refused; a number of the men stopped work, the company laid them off for two weeks as a disciplinary measure, and the Board held this to violate § 8(a) (1). Enforcement of the Board's order was denied by the Court of Appeals, which held that in the absence of a "cer-

tified bargaining representative through whom the employees could process their grievance," complaint by the minority group was protected concerted activity within § 7, but that in view of the employer's need to remain neutral in the battle between the unions, the rule by which it refused to entertain grievances unless presented individually was reasonable.

■ Without taking any position on the difficult issues suggested by these decisions, we think the Board's order here should be enforced, although we wish the Board had explained its position more thoroughly. Despite the recognized status of Local 355 and the existence of the collective bargaining contract, the examiner reasonably found that "Local 355 had no [grievance] committee functioning at the plant at the time in question." In this vacuum the employees were not required to rest their § 7 rights on the hope that when a grievance arose, the individual employee affected would somehow manage to obtain a hearing, which the employee discharged on April 11 had obtained only through a work stoppage. The examiner found that the committee desired by the employees was to be a grievance committee and nothing more. The situation here was significantly different from that in Kearney & Trecker. There the employer had given assurances that grievances would be processed through previously established channels, but had declared by well-publicized rule that they must be presented individually. Here the company president himself recognized the absence of any established grievance procedure, and invited the employees to fill the gap by electing a shop committee. Although he might have been justified in rejecting a committee so dominated by the IUE as to indicate an attempt at "backdoor recognition," and his rejection of the results of the April 12 election may thus have been defensible on the ground that the IUE representative had paid the rent for the hall, the examiner and the Board were warranted

2. This decision was overruled on other grounds in Local 259, Int'l Union UAW

(Fanelli Ford Sales), 133 NLRB 1468 (1961).

in finding that his rejection of the committee on April 19, after it had been unanimously chosen by 95 of the 120 employees at a meeting free of IUE sponsorship, could claim no such justification. It was thus proper, on the particular facts of this case, for the Board to conclude that Lundy had violated § 8(a)(1).[3]

■ Lundy's final argument relates to the provision in the order directing it to withhold recognition from Local 355 unless and until that union is certified. It does not contend that the Board may never make such an order, as indeed it could not in view of such decisions as International Ladies' Garment Workers' Union v. N. L. R. B., 366 U.S. 731, 739, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), and National Labor Relations Board v. Revere Metal Art Co., 280 F.2d 96, 100 (2 Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 189 (1960); see also National Labor Relations Board v. District 50, U.M.W., 355 U.S. 453, 459, 78 S.Ct. 386, 2 L.Ed.2d 401 (1958). But it stresses the Board's statement that although it has "rejected the contention that in every case involving assistance in violation of Section 8(a)(2), we should mechanistically order the employer to cease

recognizing the assisted union," citing Lykes Bros. Inc. of Georgia, 128 NLRB 606, 611 (1960), so broad an order was proper here because of "the background evidence, showing that the Respondent coerced its employees into designating Local 355 as their collective bargaining representative, and that Local 355 never was their free choice". This, Lundy claims, transgressed the ruling in Local Lodge No. 1424, I. A. M. v. N. L. R. B., supra, with respect to the six-month statute of limitations in § 10(b), which led to our previous remand. However, the Supreme Court said in that very decision that "where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices [,] * * * earlier events may be utilized to shed light on the true character of matters occurring within the limitations period." 362 U.S. at 416, 80 S.Ct. at 826, 4 L.Ed.2d 832. It follows *a fortiori* that in such a situation the Board may look to earlier events to determine the appropriate remedy to be prescribed; there is no need to cite the many opinions elaborating on the breadth of the discretion accorded to the Board in framing remedies.

Enforcement granted.

---

3. In so holding we have no need to determine the continuing validity of the Douds case, either as an unqualified interpretation of the proviso to § 9(a) or as limited to situations where the certified union has not entered into a collective bargaining contract or where such a contract has been made but does not provide for grievance procedures. Nor need we consider whether the Board's order, even if not sustainable under § 8(a)(1), could be upheld under § 8(a)(2) on a ground, running rather counter to the Kearney & Trecker decision, that Lundy's rejection of the elected grievance committee because of its alleged IUE tinge constituted illegal support to Local 355; owing to the unsatisfactory and cryptic nature of the Board's Decision, and particularly its use of the word "thereby," see supra at p. 924, we cannot tell whether or not the finding of a § 8(a)(2) violation was intended to encompass this aspect of the company's conduct or to refer only to the discharge and refusals to reinstate. Likewise, since there was no finding that Local 355 was being illegally supported at the time of the refusal to recognize the grievance committee, we need not consider whether reliance on a contract with that union, even though valid when executed, might constitute a violation of § 8(a)(2).