452 F.2d 1312
 78 L.R.R.M. (BNA) 2641, 146 U.S.App.D.C. 383,
66 Lab.Cas. P 12,159
 WINE & LIQUOR SALESMEN & ALLIED WORKERS LOCAL UNION #195,
etc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Brescome
Distributors Corporation, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
The BRESCOME DISTRIBUTORS CORPORATION, Respondent, Wine &
Liquor Salesmen & Allied Workers Local Union #195,
etc., Intervenor.
 Nos. 23731, 23867.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 27, 1970.
Decided Nov. 3, 1971.
 
 Mr. Laurence Gold, Washington, D. C., for petitioner in No. 23,731 and intervenor in No. 23,867. Mr. J. Albert Woll, Washington, D. C., was on the brief for petitioner in No. 23,731 and intervenor in No. 23,867.
 Mr. Charles Both, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Herman M. Levy, Atty., National Labor Relations Board, were on the brief, for petitioner in No. 23,867 and respondent in No. 23,731.
 Mr. Jerome H. Somers for intervenor in No. 23,731 and respondent in No. 23,867.
 Before BAZELON, Chief Judge, and ROBB, Circuit Judge, and JOHNSON,* Chief Judge, U. S. District Court for the Middle District of Alabama.
 PER CURIAM:
 
 
 1
 These cases began with charges brought against Brescome Distributors Corporation (the Company) by the Wine and Liquor Salesmen and Allied Workers Local Union No. 195, a/w Distillery, Rectifying, Wine and Allied Workers International Union of America, AFL-CIO (the Union or Distillery Workers). The charges resulted in a complaint before the National Labor Relations Board alleging that the Company had violated Secs. 8(a) (1), 8(a) (2), and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a) (1), 158(a) (2), and 158(a) (5). More specifically, the complaint alleged that by various acts and conduct the Company (1) interfered with, restrained and coerced employees in the exercise of their rights under Sec. 7 of the Act, 29 U.S.C. Sec. 157; and (2) in 1952 initiated, formed, sponsored and promoted the Brescome Distributors Employees Association, and from on or about June 6, 1967 assisted, dominated, contributed to the support of, and interfered with the administration of the Association. The complaint further alleged that from on or about June 6, 1967 the Company refused to bargain with the Distillery Workers.
 
 
 2
 The Board found that the Company unlawfully assisted and interfered with the Association in violation of Secs. 8(a) (1) and (2) of the Act. The Board did not find that the Company had dominated the Association. The Board concluded that the Company violated Sec. 8(a) (5) of the Act by refusing to bargain with the Distillery Workers, although that Union had been selected as their representative by a majority of the Company's salesmen, constituting an appropriate bargaining unit. The Board ordered the Company to bargain with the Distillery Workers and to cease and desist from recognizing the Association unless the Association was certified as the representative of the Company's employees in an election conducted by the Board.
 
 
 3
 In these consolidated proceedings the Board in No. 23,867 petitions for enforcement of its order. By petition for review in No. 23,731 the Distillery Workers challenge the Board's failure to find that the Company dominated the Association and its failure to order the disestablishment of the Association. The Company contends that both the Board's petition for enforcement and the Union's petition for review should be denied. We affirm the Board.
 
 
 4
 The Brescome Distributors Corporation is engaged in the wholesale distribution of wines and liquors. Its business is conducted from a warehouse and office building in Hartford, Connecticut. The Company employs warehousemen, truck drivers and wine and liquor salesmen. The members of the Brescome Employees Association are salesmen and drivers employed by the Company. The Association was organized in 1952 and in that year, pursuant to a consent election, was certified by the Board as the representative of all the Company's employees, excluding electrical employees, guards, professional employees and supervisors. It appears that in the years between 1952 and 1967 the Association from time to time negotiated with the Company on various terms of employment for its members. Agreements were reached on such matters as salesmen's commissions, wages of warehousemen and drivers, hours of work, holidays and paid vacations, and life and medical insurance. Some of the agreements were oral, others were reduced to writing.
 
 
 5
 In 1967 some of the salesmen undertook to arrange for their representation by the Distillery Workers. In their effort to affiliate with the Distillery Workers the salesmen consulted Ralph Canton, President of the Union's Local 195. Canton came to Hartford and in a series of meetings in May and June of 1967, talked to the salesmen about the advantages of the Union and explained the procedure that would be followed to secure recognition from the Company. By June 3, 1967 ten of the Company's nineteen salesmen had signed cards designating the Distillery Workers as their sole collective bargaining agent;[1] and on June 6 Canton sent the Company a letter stating that the Union represented a majority of the salesmen. He requested a meeting on or before June 12 for the purpose of negotiating a contract. The Company did not reply and on June 12 the Union filed a petition for certification with the regional office of the Board.
 
 
 6
 The Union's activity stimulated action by Samuel Lentz, President of the Company, Mervyn Lentz, Vice President, and Stanley Goldstein, Comptroller. Beginning on June 16 Mervyn Lentz and Goldstein talked to salesmen individually, questioning them about the Union's activities, asking them to adhere to the Association and telling them that there was no need for an outside union, that the Association had done much for the salesmen and that the Company and the Association could continue to work as "a big, happy family". They suggested that an outside union might reduce earnings or demand that more salesmen be hired, thereby reducing each salesman's territory. They said the Union might interfere with the operation of the Company's pension plan or the availability of loans from the credit union. The President of the Company, Samuel Lentz, called one salesman into his office and said he would like to keep the Union out. He suggested the formation of a committee of three or four salesmen to assist in running the Company. He said that his son, Mervyn Lentz, was expected to take over the business, and if the men selected the Union this would be a "slap in the face" to Mervyn.
 
 
 7
 On Friday, June 23, Samuel Lentz instigated and encouraged Al Paul, the President of the Association, to call a meeting of the Association. Paul arranged for a meeting on the following Friday but was directed by Mervyn Lentz to schedule it for that same afternoon. Paul complied and the meeting was held in the office of the Association's attorney, Mr. Adinolfi. In Mr. Adinolfi's absence the meeting was conducted by his associate, Mr. Kelly. Mr. Kelly suggested that the salesmen vote on authorizing the Association to continue as their bargaining agent. Some of the salesmen did not wish to vote at that meeting and one asked to see a copy of the Association's contract with the Company. Accordingly, another meeting took place on June 30, when a copy of the 1960 Association contract was made available for inspection. In attendance were seventeen salesmen and two employees, Amoroso and Sandler, found by the Board to be supervisors. It was decided by a 16 to 3 vote to continue with the Association as the salesmen's bargaining representative.
 
 
 8
 On July 5 counsel for the Association, the Company and the Union signed an agreement for a consent election to be held on July 21 with both the Association and the Union appearing on the ballot. The appropriate unit agreed upon was "All wholesale salesmen * * * excluding office clerical employees, warehousemen, deliverymen, professional employees, and supervisors * * *".[2] A few days later the salesmen were told, either by the Company's switchboard operator or by direct calls from Mr. Adinolfi, to go to his office to sign papers authorizing the Association to act as their bargaining representative. Between July 7 and July 19 fourteen salesmen signed these authorizations.
 
 
 9
 On July 17, four days before the election, Mr. Adinolfi instructed Association President Paul to tell warehouse manager Geraci to assemble the drivers at Adinolfi's office. Paul made the arrangements and told Adinolfi that the drivers would be there. Adinolfi said it would not be necessary for Paul to attend the meeting. The next day Adinolfi told Paul to come to his office that evening. When Paul arrived Geraci and the drivers were there. Paul was shown a contract covering the drivers' terms of employment and Adinolfi told him to sign it. Noting that it was a good contract for the drivers, Paul signed. Neither Paul nor the Association had anything else to do with the contract, which did not cover the salesmen.
 
 
 10
 In interviews with salesmen on the day before the election Samuel Lentz used the new contract with the drivers as an argument in favor of the Association. He said that now that the Company had this contract it could no without salesmen if necessary, that it could take orders over the telephone and the drivers could deliver to customers even if the salesmen were on strike. He repeated the refrain that the Association and the Company should continue as "one big family" and that the appearance of an outside union might cause the loss of benefits derived from the credit union. He explained that he did not want his son Mervyn to be "choked" by the Union, and he asked one older salesman to talk to some of the younger men to "see if they couldn't keep what we had and keep the Distillery Union out". He told one salesman that he had "never lost a fight in his life and wasn't about to lose this one".
 
 
 11
 During the period of a few days just before the election Goldstein and Mervyn Lentz, in statements to salesmen, continued their propaganda against the Union and in favor of the Association. Telephoning salesman Shea at his home, they told him they understood he was leaning to the outside Union but they wanted the salesmen to continue with the Association. Meryvn Lentz reminded Shea of the progress the Company had made and said the salesmen would be showing a "lack of confidence in management" if they allowed the outside Union to come in and run the company. He said that if the Union came in the only thing the salesmen could do would be to strike, since the Company did not have to agree to any contract. He concluded that "we don't need any outsiders" since the salesmen had their own Association. On the day before the election Mervyn Lentz told Shea flatly that he wanted him to vote for the Association.
 
 
 12
 Pursuant to the consent agreement the election was held on July 21 with all nineteen eligible salesmen casting ballots; there were ten votes for the Association and nine for the Union.
 
 
 13
 Immediately following the election, Mervyn Lentz again addressed the salesmen as a group. Because he believed that the closeness of the vote indicated some dissension among the men, he suggested that they form a bargaining committee to work closely with the Company in ironing out their problems. A meeting to work on a new contract was set for the following Friday. However, on Monday, July 24, the salesmen were informed that there would be a meeting that night at Mr. Adinolfi's office. Leaving the Company's office that evening, salesman Alfred Cohen was approached by Samuel Lentz. Lentz requested that, if possible, Cohen nominate "Sonny Sposito and Leo Maynard for the bargaining committee". Although Sposito and Maynard were later named to the bargaining committee, Cohen did not nominate them.
 
 
 14
 At the meeting on July 24 Adinolfi explained that it was necessary to call the meeting on such short notice because Samuel Lentz wanted the contract signed before the vacation period began the first week in August. The salesmen then elected a bargaining committee consisting of Al Paul, Leo Maynard, Sonny Sposito, Frank Smith, and Norman Goldman. The committee compiled a list of fourteen grievances upon which the negotiations with the Company were to be based.
 
 
 15
 On Thursday, July 27, the bargaining committee met with the Company's representatives. At the meeting, the salesmen's bargaining committee informed the Company of their fourteen grievances. After a discussion of the grievances, the meeting was adjourned; no commitments were made.
 
 
 16
 The following morning the Company presented the salesmen with a completed contract, which did not cover all the matters discussed the night before. The salesmen discussed the proposed contract but would not approve it. Throughout the day, the committee negotiated with the Company, periodically reporting to and receiving advice from the salesmen who were assembled in another room. At the end of the day, the Company and Association reached agreement on a 3-year contract which provided that the Company would pay the salesmen $100.00 vacation pay, and in the first year of the contract, one-half of the salesmen's Blue Cross and Connecticut Medical Service (CMS) premiums; and that in subsequent years the Company would pay all the premiums.
 
 
 17
 At a meeting of the salesmen in Adinolfi's office on the following Monday, Paul signed the contract on behalf of the Association. Just before the vacation period was to begin, Mervyn Lentz announced that the Company could not sign the contract because of litigation before the Board. Nevertheless, Lentz assured the salesmen that the Company would live up to the terms of the contract. Thereafter, the salesmen received the vacation and insurance benefits.
 
 
 18
 On October 13, the Association met and voted to suspend collection of dues and election of officers pending the conclusion of the Board proceedings.
 
 
 19
 Considering the record as a whole we think there is substantial evidence to support the Board's conclusion that the company illegally assisted and interfered with the Association. In particular we think the evidence we have summarized supports the findings of the trial examiner and the Board, "that within the period of the Section 10(b) [29 U.S.C. Sec. 160(b)[3] limitation Respondent violated Secs. 8(a) (1) and (2) by a course of conduct which included, among other conduct, individually interrogating its salesmen concerning their interest in the Union while impressing upon them its favor for their continued representation by the Association; coercively expressing its antagonism to the Union; instigating and directing the holding of meetings by its salesmen for the purpose of securing their authorization of further representation by the Association; and executing a contract, not negotiated by the Association's officers or bargaining representatives, providing substantial benefits for its drivers and warehousemen, for the purpose of further demonstrating its beneficence toward employee representation by the Association." (J.A. 4) Such conduct, properly found by the Board, is enough to demonstrate that the Company assisted and interfered with the Association. International Association of Machinists, Lodge No. 35 v. NLRB, 311 U.S. 72, 61 S.Ct. 33, 85 L.Ed. 50 (1940); NLRB v. Link-Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941); NLRB v. Clement Brothers Company, 407 F.2d 1027 (5th Cir. 1969); NLRB v. Park Edge Sheridan Meats, Inc., 323 F.2d 956 (2d Cir. 1963). The statements of Mervyn and Samuel Lentz and Goldstein, to which we have referred, and which the Board found to be coercive, were not protected by the First Amendment or Sec. 8(c) of the Act, 29 U.S.C. Sec. 158(c). International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).
 
 
 20
 The Board also agreed with the trial examiner's finding that the Company violated Secs. 8(a) (1) and (2) of the Act by the membership in the Association, during the relevant period, of two supervisors, one of whom served as vice president of the Association. This finding refers to Sandler, Sales Manager, and Amoroso, Wine Sales Manager. The Company contends earnestly that these men were not supervisors within the meaning of the Act.[4]
 
 
 21
 The determination of who is and who is not a supervisor requires the Board to exercise its informed and expert discretion. The critical factors are subtle and varied. Each case must be decided on its own facts; and the Board's determination will stand if it has support in the record and a reasonable basis in the statute. NLRB v. Swift and Company, 292 F.2d 561, 563 (1st Cir. 1961) quoted with approval in Marine Engineers Beneficial Association v. Interlake Steamship Company, 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962); NLRB v. Big Ben Department Stores, Inc., 396 F.2d 78, 82 (2d Cir. 1968). Possession of any one of the powers enumerated in the statute is sufficient to establish supervisory status. NLRB v. Elliott-Williams Company, 345 F.2d 460, 463 (7th Cir. 1965); Warner Company v. NLRB, 365 F.2d 435, 437 (3rd Cir. 1966); NLRB v. Quincy Steel Casting Company, Inc., 200 F.2d 293, 295 (1st Cir. 1952); Ohio Power Company v. NLRB, 176 F.2d 385 (6th Cir. 1949), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949).
 
 
 22
 After careful consideration of the pertinent evidence, including the testimony of Sandler (J.A. 1598-1685), Amoroso (J.A. 1686-1733), and Mervyn Lentz (J.A. 1314-1342) we conclude that there is substantial support for the Board's finding. Although Sandler and Amoroso did not have authority to hire or fire employees or to set Company policy, the record discloses that they had and exercised much authority and discretion in conducting the operations of the Company. They visited customers and investigated their complaints for the Company. It was also their duty to accompany salesmen on their rounds, work with them on their problems and assist and advise them if it appeared that they needed help. On one occasion they investigated the alleged misconduct of a salesman, recommended his dismissal, and he was dismissed by Mervyn Lentz. Subject to the approval of Mervyn Lentz, they helped to develop the monthly quotas for each product and assign them to individual salesmen. They also reviewed the selling records of the salesmen. They participated in the assignment of accounts to the salesmen and the transfer of accounts among them. It is significant also that Sandler was employed under a written contract at a fixed salary, whereas salesmen were paid commissions. Sandler's card, which he handed out to the trade, described him as "Sales Manager" and Amoroso's card designated him as "Wine Sales Manager". Finally, we note that before the consent election in July 1967 the Company agreed that Sandler and Amoroso were supervisors within the meaning of the Act and therefore ineligible to vote. In short, it was not unreasonable for the Board to conclude that Sandler and Amoroso were something more than salesmen, that they had the kind of responsibility and authority that brought them within the statutory definition of supervisor.
 
 
 23
 The trial examiner found that one of the organizers of the Association in 1952 was sales supervisor Horowitz, who was thereafter elected treasurer of the Association, met with its board of trustees, and in 1956 was a member of its negotiating committee. The trial examiner also found that in 1964, when the Association was without funds to pay its counsel, the Company "advanced" $300.00 to the Association treasurer. He further found that in 1956 the Company retained the law firm with which Mr. Adinolfi was then associated. The trial examiner considered these matters as background, but since they all occurred more than six months before the charge was filed on July 27, 1967, and in view of Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b), he did not find them to be unfair labor practices, and did not find that the Company dominated the Association.
 
 
 24
 The Union contends that the trial examiner and the Board misapplied Sec. 10(b) of the Act by failing to give adequate weight to the evidence of events occurring prior to the statutory period. We do not agree. We think the trial examiner correctly relied upon this evidence only to shed light on the events occurring within the limitations period. Local Lodge No. 1424, I.A.M. v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). NLRB v. Lundy Manufacturing Corporation, 316 F.2d 921 (2d Cir. 1963), cert. denied, 375 U.S. 895, 84 S.Ct. 171, 11 L.Ed.2d 124 (1963), cited by the Union, does not require a contrary conclusion. That case stands only for the proposition that in fashioning remedies it is proper for the Board to consider not only conduct occurring within the Sec. 10(b) period of limitation but also conduct prior to that period; it does not authorize a finding of an unfair labor practice on the basis of evidence of such prior conduct. In any event we think there is a reasonable basis in the record for the Board's conclusion that although the Company interfered with the Association during the statutory period, the interference did not amount to domination.
 
 
 25
 Pursuant to Sec. 9(b) of the Act, 29 U.S.C. Sec. 159(b), the Board decided that the appropriate bargaining unit consisted of the Company's salesmen, excluding warehousemen and deliverymen. Unless we could find that this determination is irrational and arbitrary it is beyond our power to review. Retail, Wholesale & Department Store Union v. NLRB, 128 U.S.App.D.C. 41, 385 F.2d 301 (1967). We think the determination was a reasonable exercise of the Board's discretion, in view of the diversity of interest between the salesmen and other employees and the differences in their working conditions and duties.
 
 
 26
 The Board found that when the Union requested recognition on June 6, 1967, eleven of the nineteen salesmen in the bargaining unit had signed cards validly designating the Union as their bargaining representative. Although the cards are unambiguous (see Footnote 1) the Company argues that they are unreliable evidence because the Union organizer represented that they would be used only to obtain an election. This issue, however, was carefully considered by the trial examiner, who analyzed and weighed the testimony and concluded that the signatures on the cards were not obtained by misrepresentation. We think the record supports his conclusion. See Jas. H. Matthews & Company v. NLRB, 354 F.2d 432 (8th Cir. 1965), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966).
 
 
 27
 Applying the principle of NLRB v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board entered a bargaining order. In the circumstances we think this was proper. The Company contends that when confronted with the Union's request for recognition it was entitled to await a Board resolution of the conflicting claims of the Union and the Association. The argument is derived from the doctrine of Midwest Piping & Supply Company, 63 N.L.R.B. 1060 (1945). As stated in that case this doctrine is:
 
 
 28
 a neutral employer, on being confronted with conflicting representation claims by two rival unions, "would not negotiate a contract with one of them until its right to be recognized as the collective bargaining representative had been finally determined under the procedure set up under the Act." 63 N.L.R.B. 1070.
 
 
 29
 In the case before us, however, the employer did not remain neutral but instead actively and unlawfully supported the Association and urged the salesmen to reject the Union The Company is therefore not in a position to invoke the Midwest Piping & Supply Company doctrine.
 
 
 30
 The petition for enforcement is granted.
 
 
 31
 The petition for review is denied.
 
 
 32
 BAZELON, Chief Judge (concurring in part and dissenting in part):
 
 
 33
 I agree that the Board's findings of violations of Sec. 8(a) (1) and Sec. 8(a) (5) of the National Labor Relations Act should be enforced. I do not agree, however, that the Board correctly applied Sec. 10(b) statute of limitations in its determination of the Sec. 8(a) (2) violation.
 
 
 34
 The Trial Examiner found that the evidence within the six months limitation period established a violation of Sec. 8(a) (2). Terming the violation one of "assistance" rather than "domination," the Examiner refused to order the disestablishment of the Association. In making this determination he excluded certain significant evidence because the events took place prior to the Sec. 10(b) period.[1]
 
 
 35
 There is no disagreement as to the applicable law. Pre-limitation evidence may not be used where "conduct occurring within the limitations period can be charged to be an unfair labor practice only through the reliance on an earlier unfair labor practices."[2] But where, as here, a violation has been found on the basis of conduct within the six month period, the Board may fully consider evidence of earlier events in formulating a remedy.[3] The Court today restricts the use of pre-limitation evidence for remedial purposes by viewing "domination" as an unfair labor practice separate and distinct from "assistance" as an unfair labor practice. Majority opinion at 390 of 146 U.S.App.D.C., at 1319 of 452 F.2d. But the Supreme Court has recognized the distinction between "assistance" and "domination" only for remedial purposes.[4] Moreover, the wide range of discretion properly accorded the Board in formulating a remedy[5] counsels against any characterization of the choice between assistance and domination which would limit that discretion.
 
 
 36
 Nor does the policy underlying Sec. 10(b) support a more restricted use of prelimitation evidence. Section 10(b) is designed to bar litigation of stale claims, hence the Supreme Court's admonition against "a finding of violation which is inescapably grounded on events predating the limitations period."[6] But since conduct within the limitations period has already been found to be an unfair labor practice, there is no danger of a stale claim; pre-limitation evidence will be relevant only if the conduct evidenced is still operative on the union-company relationship.
 
 
 37
 In my view the Board should have fully considered the pre-limitations evidence and a remand should be ordered for that purpose Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699, cert. denied, Kohler Co. v. Local 833, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962).
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(c) (1964)
 
 
 [1]
 The card stated:
 [seal] DISTILLERY, RECTIFYING, WINE AND ALLIED WORKERS' INTERNATIONAL UNION OF AMERICA AFL-CIO
 I hereby designate Local No. , Distillery, Rectifying, Wine and Allied Workers' International Union of America, AFL-CIO, or its representatives, as my sole collective bargaining agent, and authorize them to represent me in any and all proceedings involving my right to designate a collective bargaining agent and also grant them the right to negotiate with my employer an agreement relating to wages, hours, and other conditions of employment.
 --------------------- ------------------------
 Date Signature
--------------------- ------------------------
 Print Name Print Home Address
--------------------- ------------------------
 Print Employer's Name Print Employer's Address
 THE ABOVE INFORMATION IS CONFIDENTIAL AND APPLICANT'S EMPLOYMENT IS PROTECTED BY LEGISLATION
 
 
 [2]
 It was agreed that Amoroso and Sandler were supervisors and therefore ineligible to vote within the meaning of the Act
 
 
 [3]
 Sec. 10(b), 29 U.S.C. Sec. 160(b) provides "That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *". The charge here was filed July 27, 1967
 
 
 [4]
 Sec. 2(11), 29 U.S.C. Sec. 152(11) defines a supervisor as follows:
 The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 [1]
 The Trial Examiner described these events as follows:
 Respondent through its supervisors, assisted in the formation of the Association, took an active part in the administration of that organization, and, on occasion, apparently sat on both sides of the bargaining table, as when Horowitz was a member of the Association's bargaining committee. The fact that Horowitz and Tarre were treasurers of the Association for so many years also accounts for the established habit of the salesman, difficult to understand otherwise, of paying dues into the organization although they received little or no benefit from it. The record is also clear that Respondent gave substantial financial assistance to the Association, whether the money be considered a gift or an indefinite advance. However, all of this occurred prior to January, 1967, and may not in itself be found to be an unfair labor practice.
 Trial Examiner's Decision, JA-I, p. 32-33.
 His opinion later makes explicit that his finding of no domination is conditioned by the limitation on the available evidence he felt was imposed by Sec. 10(b):
 However, as Respondent well argues, the proof presented by the General Counsel, falling within the six month period prior to the filing of the charge, does not support his contention that the Association was dominated by Respondent and it is so found.
 Trial Examiner's Decision, JA-1, p. 37.
 
 
 [2]
 Local Lodge No. 1424, I.A.M. v. NLRB, 362 U.S. 411, 416, 80 S.Ct. 822, 827, 4 L.Ed.2d 832 (1960)
 
 
 [3]
 NLRB v. Lundy Mfg. Co., 316 F.2d 921 (2nd Cir.), cert. denied, 375 U.S. 895, 84 S.Ct. 171, 11 L.Ed.2d 124 (1963)
 
 
 [4]
 In NLRB v. District 50, UMW, 355 U.S. 453, 78 S.Ct. 386, 2 L.Ed.2d 401 (1957), the Supreme Court recognized the distinction between "assistance" and "domination" but justified that distinction in terms of the choice of an appropriate remedy:
 The basis for the distinction is that, in the Board's judgment, the free choice by employees of an agent capable of acting as their true representative, in the case of a dominated union, is improbable under any circumstances, while the free choice of an assisted but undominated union, capable of acting as their true representative, is a reasonable possibility after the effects of the employer's unfair labor practices have been dissipated.
 Id. at 459, 78 S.Ct. at 390 (emphasis in the original). A finding of domination suggests the disestablishment of the union; a finding of mere assistance suggests a withdrawal of recognition until recertification. Id. at 468, 78 S.Ct. 386, 2 L.Ed.2d 401.
 
 
 [5]
 See, e. g., NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); International Brotherhood of Operative Potters v. NLRB, 116 U.S.App.D.C. 35, 38-39, 320 F.2d 757, 760-761 (1963)
 
 
 [6]
 Local Lodge No. 1424, I.A.M. v. NLRB, 362 U.S. 411, 422, 80 S.Ct. 822, 829, 4 L.Ed.2d 832 (1960)